WILBUR M. MILLER, Appellant, v. WHITE BRONZE MONUMENT Co., Appellee.

**Master and servant:** SAFE PLACE TO WORK: ASSUMPTION OF RISK: EVIDENCE. In an action to recover for personal injuries to plaintiff while employed in a building, the question of the employer's negligence in failing to provide plaintiff a safe place to work by repairing the floor of the building, and the plaintiff's assumption of the risk by continuing in the employment after a promise to repair, are held under the evidence to have been for the jury.

**Same:** PROMISE TO REPAIR DEFECTS. An employee who continues to work in a building with knowledge that the floor of the room is unsafe assumes the risk incident thereto, unless he objects to the unsafety of the place and remains under a promise of repair, in which event he does not assume the risk during a reasonable time for the master to make the repairs; unless, of course, the hazard is so great that a person of ordinary care knowing the same

would not continue the service. What is a reasonable time to remain in the service after a promise of repair, and whether an employee is justified in remaining even upon such promise, are ordinarily questions for the jury.

**Same:** DUTY OF SERVANT TO REPAIR. A servant who is not employed to do carpenter work is under no obligation to repair an unsafe place in the building in which he is engaged; and even if he was he is relieved of the duty by an order of his superior directing him not to make the repairs, so that his failure to do so is not negligence.

**Contributory negligence:** EVIDENCE. It is the duty of an employee to exercise reasonable care for his own safety, and if he knows, or by the exercise of reasonable care should have known of a defect in the floor of a building in which he was employed, and of its dangers, his temporary forgetfulness of the dangerous situation is not an excuse for failure to exercise such care. Evidence held to show plaintiff guilty of contributory negligence in stepping into a hole in the floor of the building in which he was at work.

**Assumption of risk:** CONTRIBUTORY NEGLIGENCE: EVIDENCE: DISTINCTION. Assumption of risk is a waiver of defects or dangers and consent on the part of an employee to assume them regardless of the exercise of care on his part, and is a matter of contract, while contributory negligence grows out of the conduct of an employee and is not based upon any contract relation.

*Appeal from Polk District Court.*—Hon. W. H. McHenry, Judge.

TUESDAY, NOVEMBER 24, 1908.

REHEARING DENIED THURSDAY, MARCH 18, 1909.

ACTION at law to recover damages for injuries received by plaintiff while in defendant's employ. The defenses were assumption of risk, contributory negligence, and a claim that the defect which resulted in the injury was one of plaintiff's own making, which it was his duty to discover and repair. At the conclusion of plaintiff's evidence, a verdict was directed for defendant, and plaintiff appeals.—*Affirmed.*

*Spurrier, Mills & Perry,* for appellant.

*C. W. Johnston* and *J. D. Wallingford,* for appellee.

Deemer, J.—It is charged in the petition that defendant was negligent in not furnishing plaintiff a reasonably safe place to work, in not furnishing him proper tools and appliances with which to work, in not discovering and repairing a defect in the floor of its plant in which plaintiff was employed, in failing to notify plaintiff of the dangerous condition of the floor, and in requiring plaintiff to work in a dark and dimly lighted room, which had a defective floor, without informing him of the dangers incident thereto. The defenses have already been stated. In passing upon the questions involved on this appeal, we must take that view of the testimony most favorable to plaintiff, for the case was disposed of on defendant's motion for a directed verdict. At the time of the accident plaintiff was twenty-nine years of age. He had worked for defendant at odd times for a period of four years. Just before his injury he had been in defendant's employ about six weeks. He was employed about the manufacture of what are called "white bronze monuments," and on the occasion of his injury was doing what is known as "sticking and pouring," with the promise that as soon as the work was brought up he should do the "lettering" on the monuments. One Groth, a foreman of the defendant, employed the plaintiff, and he was succeeded in the foremanship by one Topliff. The room in which plaintiff worked was a large one, the exact size of which does not appear in the record; but it was more than one hundred feet one way by sixty or more the other. There are windows in the south and west ends of the building eight by three and one-half feet, but some of them were dirty and cut off by a cheese cloth, which obstructed about one-third of the light. Near the west end

of the building were two benches upon which plaintiff did his work. About thirty-five feet from the west end of the building, there was a forge in which zinc was melted, and near one of the tables or benches was a small stove or soldering pot where solder and soldering irons were heated. About these tables, stoves and forges plaintiff was at work "sticking and pouring;" that is to say, sticking the various parts of the metal monuments together and joining them with solder. Plaintiff's account of how the accident occurred is as follows:

When I was injured I was working at the tinning bench tinning some castings. We had a large piece about, I don't really know the exact size of it, but it was about

1. MASTER AND SERVANT: safe place to work: assumption of risk: evidence.

five feet by four, about that high (indicating), like a frame, and had already poured that. That was to be the bottom of a monument, and there was another part to go on top of it. Those pieces had been taken up to the finisher's bench. We finished them there first; done the filling on them and smoothing them, and Mr. Topliff, the foreman, took this piece I was on when I got hurt. He brought it down and set it down near the fusing bench. He called me then, and we took a sort of chainhack and lifted the top over on it to see how it would fit, and we lifted it off again, and Mr. Topliff told me to go ahead and finish. The fusing bench was about 20 inches from where he had set this piece, and the acid which was used to put on before putting the solder on was sitting on that bench. I went to reach for the acid. I was in a hurry, and the work had been hurrying us up, and I was anxious myself to try to help them out and get orders finished up. I stepped over into the center of that piece and made another step, intending to reach for the acid bottle and turn around and stay inside of it and put the acid around and go out and get my soldering iron, but, instead of stepping on solid floor, as I thought I would, I went into a hole and caught my knee, and went to sort of throw the other leg over at the time I set that foot down, and fell into the hole. My leg went down into the hole and caught me about

the knee.   The hole was just about wide enough to catch
my knee.   I fell, and it caught me by the knee.

Plaintiff also testified to the following:

Before my injury I had a talk with the foreman re-
specting the condition of that place.   The first time we
talked of the holes in the floor was during the month of
May.   I can't remember.   It was along about the latter
part of May.   Mr. Topliff was the foreman then.   The
next time I talked with him was about a week later.   I
talked with him three times about that.   The third time
was about—it was during the same week · I got hurt, three
or four days before I got hurt.   I had a big monument I
was working on, and I called a couple of the other em-
ployees to help me lift it, and when they went to lift it
one of the boards cracked, and Mr. Topliff happened to be
passing, and I turned around to him and I said:   'John,
you will have to get this floor fixed up now before some
of us get hurt.'   He said: 'All right.   I have been intend-
ing to fix it all along, but I will fix it as soon as I get
time.'   I never knew of any custom about every man re-
pairing the floor.   I was never required or directed to do
any carpentering there.   There was a carpenter there that
did the carpenter work.   I continued to work after I dis-
covered that the floors were defective and that there were
holes in the floor, because Mr. Topliff said he was going to
fix it.   I continued to work, relying on his promise to fix
it.

He also testified regarding the condition of the light:

Q.   I will ask you if you remember on this afternoon
that you were injured what the condition of the interior
of that factory was at the place where you were injured
with respect to light, whether it was dark, or medium, or
how ?   A.   It was very gloomy.   Q.   What was the gen-
eral condition of the interior of the factory as to being
light or otherwise ?   A.   It is generally rather dark.   It
wasn't real light.   It was light enough, you could see what
you were doing and see your work, but it wasn't real light.
It wasn't as bright as it is in this room.   Q.   State whether

or not artificial lights were used in the factory in the day-time. Let me modify the question. State whether or not it was customary among the workmen there on dark days and during the daytime, midday, to use candles or other artificial lights when engaged about their work. A. I have known them to use candles.

On cross-examination the witness stated: That the hole in the floor was about twenty .inches south of the bench at which he worked; that there were windows all along the entire south wall of the building and four or five in the west wall of the size hitherto mentioned, that the light from these windows shone all around the room; that the ceiling of the building was something like twelve feet in height; and that there were no partitions in the room in which he worked. It also appeared from his cross-examination that the bench at which plaintiff was working was from twelve to twenty feet from the south wall and at the west end of the room. The accident happened about three o'clock in the afternoon, and on cross-examination the witness gave this account of it:

The hole in the floor was about twenty inches south of the bench I worked at. I stepped over in the center of the base, and went to step over on the other side of it to reach for the acid, and then I stepped in the hole. The base was almost directly south of the hole. The base was about twenty-two inches south of the bench, and the hole was about twenty inches south of the bench. The base was lined right up with the hole. That is the reason I didn't see it. I didn't think of the hole at that time, because I didn't put the work there. I had not been doing my work at that place. I had always been avoiding that place. The bench stood the long distance north and south. I always put the monuments on the bench in the way that would be handiest, a long tall monument lengthwise.

The following testimony shows how the hole came to be in the floor:

Q. Now, Mr. Miller, this hole being about twenty inches south of the bench, what caused the hole in the floor ? A. Well, just the natural wear and tear. Q. Sliding these monuments off the bench onto the floor, the point of the base hitting the floor finally cut it through ? A. Yes, partly. Q. What else besides that ? A. Age, rotten. Q. How big was this hole ? A. Oh, I don't know. I never measured the hole. It was big enough for my foot to go in. Q. A small hole then ? A. Yes. Q. Four or five inches wide and probably four or five or six inches ? A. I should say about that, yes.

This hole was in existence when plaintiff began work for defendant the last time and he testified as follows:

I first called Mr. Topliff's attention to the hole in the floor in the latter part of May, somewhere along about the 23d, 24th or 25th. I again called his attention to the floor in about a week. It was before Decoration Day, about the 28th or 29th. I again called his attention to the floor about three or four days before I got hurt, sometime during the same week. I said: 'John, this floor is in awful bad shape around here. It ought to be repaired. Don't you think I had better fix it up a little ?' (Topliff) 'Well, we are too busy now. Go ahead with your work, and I will fix it up myself.' This conversation took place by the forge. He said he would fix it as soon as he got time. At the second and third conversations he said about the same things. Q. And that was in response to a request that you fix it, and he said no, he would, you go ahead with the work and he would fix it when he got time. Is that what was said ? A. Yes, sir. Q. What was said at the third conversation ? A. Well, that was referring to that big monument. A large monument on the floor—there was one board sort of cracked. It broke, sort of split, and I turned around to Mr. Topliff and said: 'When are you going to fix this floor ? It is dangerous. It will have to be fixed.' He said: 'I have been wanting to do that. It seems like I can't get time, but I will fix it up.' Q. Well, he stated the same as he had before, as soon as he got over with the rush he would fix it, did he ? A. Yes, sir. The portion of the floor that cracked that day when

the heavy monument was rolled on it was near the place where I was hurt. It was not the same place.

Aside from a little more testimony regarding Topliff's promise to repair the defect in the floor, the effect of which was that no definite time was fixed for the repairs, and that plaintiff expected to quit when his week was out if the floor was not fixed, this is substantially all the testimony material to our inquiry. From this it is manifest that there was ample to take the case to the jury upon the question of defendant's negligence in the respects charged in the petition. This testimony was also sufficient to take the question of assumption of risk to the jury; that is to say, it was a fair question for it to determine whether or not plaintiff was justified in remaining in defendant's employ after the promises of repair were made, and as to whether or not he should have concluded that defendant, through its agents, by reason of the nature of the promises and the time that elapsed after they were made without performance, had concluded not to comply with its promises and make the repairs. This view has support in the following, among other, cases: *Buehner v. Creamery Co.*, 124 Iowa, 445; *Huggard v. Glucose Co.*, 132 Iowa, 724; *Wible v. R. R. Co.*, 109 Iowa, 557; *Foster v. R. R. Co.*, 127 Iowa, 84.

Plaintiff, of course, knew of the defect which caused the injury, and that it had existed during the entire time of his last employment by the defendant. In such circumstances, he will be held to have assumed the

2. SAME: promise to repair defects.

risk incident to his employment about this defect, unless it be shown that he protested against the same to a proper officer of the defendant, and was promised that the defect would be repaired. If he made such protest, and was given a promise that it should be repaired, he did not assume the risk until such time had elapsed, without the promise being complied with, as that a person of ordinary care and prudence would understand

that the promise was not to be kept. After the expiration of such time, plaintiff, if he continued in defendant's employ, would in law reassume the hazard, and could not recover for any injuries received by reason of the defect. Of course, if the hazard was so great that a person of ordinary prudence and care would not have assumed it, knowing that continuance in the employment without repairs being made would subject him to imminent danger of life or limb, then he would not be justified in continuing to work in the presence of such a hazard. What is that reasonable time which an employee may remain in the service of his master after a promise of repair has been made without assuming the hazard, and whether or not an employee is justified in continuing his work even upon such a promise being made, are, ordinarily, questions of fact for a jury, and, if reasonable minds might honestly differ regarding the conclusions to be reached upon these propositions, they are nevertheless questions for a jury under proper ·instructions. These rules are so well established that it is sufficient to state them without further elaboration; their application to the facts hitherto recited being apparent.

Defendant contends that it was plaintiff's duty to make the repairs, and that he can not hold another responsible for his own neglect. The testimony clearly negatives any such assumption. Plaintiff was not employed to do this work. A carpenter was employed for this purpose. Moreover, upon plaintiff's suggestion that he was willing to do the work for his own protection, defendant's foreman ordered him not to do it, saying that he (the foreman) would attend to that matter himself. Even if plaintiff's duties comprehended the repair of the floor, he was subject to the orders of his superior, and in obeying them was released of his duty to repair. These, too, are elementary propositions which need no fortification by authority.

3. SAME: duty of servant to repair.

The real question in the case, and the one most relied upon for appellee, is that plaintiff was guilty of contributory negligence in stepping into the hole which he knew, or should in the exercise of ordinary care have known, was in the floor. The testimony, as we think, fails to show that the room was dimly lighted. On the other hand, it seems to have been unusually well supplied with windows both on the south and west sides. The accident happened in June, at about 3 o'clock in the afternoon. The testimony does not show that the day was cloudy, and, if it were not, it is manifest that, even if the west windows were dirty and partly obscured by cheesecloth, the place where plaintiff worked and the floor in which the hole existed was unusually well lighted. This hole was near the end of a bench where plaintiff was contantly working, and, if he barely cast his eyes upon the floor, he could not help from seeing the hole which he described in his testimony. In other words, knowing of the defect, knowing of the danger incident thereto which caused him to complain to the foreman, knowing of the promises made to repair, and the failure to keep them, the natural impulse of any reasonably prudent person would have been to look for this defect to see if it had been remedied. Plaintiff said that he expected to quit at the end of the week in which he was injured if the defect was not repaired. He was injured on Friday, and by reason of his determination he naturally must have had a watchful eye to discover the condition of the floor. Under all the circumstances, it must be found as a matter of fact, from the undisputed testimony, that plaintiff knew of the defect and of the danger incident thereto at the time he received his injuries. It could not be otherwise if he exercised any sort of care for his own safety. Indeed, plaintiff did not testify that he thought the floor had been fixed, or that he did not know the hole was still uncovered. His exact statement is

4. CONTRIBUTORY NEGLIGENCE: evidence.

that he stepped inside the four sides of an uncovered base for a moment, and then, in reaching for the acid which was upon the bench on which he was working, stepped with one foot outside the base of the monument and into the hole in the floor, which was just beyond the side of the base over which he stepped, forgetful, as he said of the hole, for the reason that he did not put the base in its then position.   Was this conduct that of an ordinarily prudent person reasonably careful of his own safety in view of his knowledge of the defect in the floor?   In its last analysis, it seems to us to be a case of pure forgetfulness or abstraction on the part of the plaintiff.   Negligence, unless gross, is generally nothing more than this.   It is the duty of an employee to use ordinary and reasonable care for his own safety, and if he knows of a defect and of its dangers, or should have known in the exercise of the degree of care required of him, his temporary forgetfulness will not excuse him.   *Barnes v. Sowden,* 119 Pa. 53 (12 Atl. 804).

Of course, if there were any testimony tending to show that plaintiff, in view of the promise made to him by defendant's foreman, believed that the defect had been remedied we should be constrained to hold that the question of plaintiff's contributory negligence would have been for a jury under all the facts disclosed; but nowhere does plaintiff testify that he believed that the foreman had complied with his promise and repaired the defect.   The excuse is that he forgot the presence of the hole, and he evidently relies upon this forgetfulness as excusing him. That it does not is clear, not only from the authorities, but on principle as well.   There is a manifest distinction between forgetfulness and an attempt to avoid the dangers of a known defect, and a like distinction between forgetfulness and reliance upon a promise made by one with authority to remedy a known defect.   Forgetfulness is negligence, while reliance upon the fulfillment of a promise

made by another or an attempt by one to avoid a known defect may constitute the highest care. These suggestions illustrate the fatal defect in plaintiff's case. He did not testify that he was attempting to avoid the known danger, but despite his care, went into the hole; nor did he testify that, because of Topliff's promise, he believed the defect had been repaired, and had no knowledge to the contrary until he stepped into the hole.

It is well in this connection, perhaps, to discriminate between assumption of risk and contributory negligence. "Assumption of risk" is in effect a waiver of defects and dangers and a consent on the part of the employee to assume them, no matter whether he be careful or negligent in his conduct. This consent is held to take away the injurious character of defendant's act, and is bottomed on the old maxim, *"Volenti non fit injuria"*—that to which a party assents is no wrong. In such cases the injured party may at the time be in the exercise of all the care which the law requires, and still have no right of recovery. This is clearly pointed out in the old case of *Thomas v. Quartermaine,* 18 Q. B. Div. 697. Of course, facts showing contributory negligence may also prove assumption of risk; but rarely, if at all, will proof that one did not assume a risk also show that at a given time he was in the exercise of ordinary prudence for his own safety. These distinctions have not always been observed, but they are essential to a proper application of the facts to a given case. See *Fitzgerald v. Connecticut Co.,* 155 Mass. 155 (29 N. E. 464, 31 Am. St. Rep. 537); *Dempsey v. Sawyer,* 95 Me. 295 (49 Atl. 1035); *Chicago & E. R. R. v. Heerey,* 203 Ill. 492 (68 N. E. 74); *Narramore v. Railroad,* 96 Fed. 298 (37 C. C. A. 499, 48 L. R. A. 68); *Davis Co. v. Polland,* 158 Ind. 607 (62 N. E. 492, 92 Am. St. Rep. 319). As said in the last case, assump-

*5. ASSUMPTION OF RISK: contributory negligence: evidence: distinction.*

tion of risk is a matter of contract, express or implied; while contributory negligence is a matter of conduct.

Without more, it is enough to say that the trial court did not err in directing a verdict for the defendant.

The judgment must be, and it is, *affirmed.*