MYRON WHEELER, Appellee, v. SIOUX PAVING BRICK COMPANY, Appellant.

Master and servant: FAILURE TO GUARD MACHINERY: NEGLIGENCE.
1 Failure to guard the set screws of a revolving shaft as required by the statute is negligence.

**Same:** VICE-PRINCIPAL: EVIDENCE. Under the evidence in this action the question of whether plaintiff, who was injured by being caught by the set screws of a revolving shaft while inspecting the machinery, was a foreman in charge of the machinery in his department, so as to be responsible for its condition and charge him with the duty of providing a cover or guards for the set screws, thus relieving his employer of that duty, was one of fact for the jury.

**Same:** ASSUMPTION OF RISK: STATUTE: REPEAL BY IMPLICATION. The statute providing that where machinery, which it is the duty of an employer to furnish in a reasonably safe condition, is defective or out of repair, a servant does not assume the risk incident to its defective condition of which he and also the employer had knowledge unless the character of the employee's duties required him to repair the same, is not to be construed as including such risks as are incident to the employment; and unless it was plaintiff's duty to have provided guards for the set screws by which he was injured he cannot be held to have assumed the risk therefrom as being incident to his employment. The statute does not by implication repeal the one requiring the superintendent or owner of a manufacturing plant to properly guard dangerous machinery.

**Same:** KNOWLEDGE OF DANGER: PRESUMPTION. Where the unguarded condition of dangerous machinery had been apparent for such length of time that in the exercise of reasonable care and diligence the employer should have known thereof, his knowledge of the condition will be presumed.

**Same:** CONTRIBUTORY NEGLIGENCE: EVIDENCE. The defense of contributory negligence is available in cases arising under the Factory Act. In the instant case the question of whether plaintiff was guilty of contributory negligence by being caught on the unprotected set screws of a shaft in the factory of his employer was for the jury.

**Same.** Ordinarily the questions of negligence in performing a service in a dangerous way, where there is another and safe way for its performance, as well as whether the servant used ordinary care for his safety, are for the jury. And where the servant's attention was diverted he is not held to the same degree of care as otherwise, and where he is thus thrown off his guard the question of his negligence is for the jury, although he would otherwise be negligent.

**Same:** VOLUNTEERS. A servant who acts in an emergency to meet conditions requiring attention so that the work may not be delayed is not subject to the rules governing a master's liability for injury

to a mere volunteer, unless the work was the special duty of another.

**Same:** DAMAGES: EXCESSIVE VERDICT. A verdict of $10,000. for injury to a stationary engineer thirty-eight years of age and earning $80. to $90. per month, resulting in several operations and final loss of one limb below the knee and much suffering, is held excessive and is reduced to $8,000.

*Appeal from Woodbury District Court.*—HON. F. R. GAYNOR, Judge.

WEDNESDAY, JULY 2, 1913.

ACTION for damages for personal injuries sustained by plaintiff while in the employ of defendant. Verdict and judgment for plaintiff from which defendant appeals.—*Affirmed* on condition.

*Parker, Parrish & Miller* and *Shull, Farnsworth & Sammis,* for appellant.

*Wright & Sargent,* for appellee.

WITHROW, J.—I. The plaintiff in his petition, in substance, alleges: That he is a resident of Sioux City, that the defendant is an Iowa corporation, and that it is engaged in operating plants at Sioux City, Iowa, for the manufacture of brick, tile, and other clay products. That at the times referred to in the petition the plaintiff was in the employ of the defendant at its North Riverside plant, "his particular duties being that of timekeeper for the men, and being about the plant to render general assistance wherever he might see that the same was necessary for the purpose of keeping the men and machinery at work, with a view to avoiding unnecessary delays and loss of time in the general conduct and operation of said manufacturing plant." That while thus engaged on the 29th of May, 1911, plaintiff came in contact with an

unprotected and unguarded shafting and set screw used in said plant and kept and maintained and operated therein as a part of the machinery for the manufacture of brick, and as a result thereof the lower portion of plaintiff's left limb was torn, wrenched, and broken so that amputation thereof became necessary, and the plaintiff became permanently disabled by reason of the loss of said limb. That the shafting referred to was used in said plant for the purpose of operating the machinery which cuts the pressed clay on the conveyor into the size of ordinary brick by means of strands of wire operated by machinery connected with the said shaft. That on said date plaintiff had passed over said shaft at the usual, ordinary, and customary place therefor for the purpose of fixing one of said wire strands which had broken. That after fixing the said wire plaintiff started to return over said shafting at the usual, ordinary and customary place. That at the time of said accident there was a collar fastened to said shafting by means of bolts or set screws which projected over and out of the same a distance of about an inch, the ends of said bolts being rough and uneven and wholly unprotected, and said collar and set screws or bolts and shafting all being wholly·unprotected and unguarded, contrary to the provisions of the statutes of the state of Iowa. That the defendant was negligent in failing to furnish the plaintiff a safe place to work, and in maintaining an unprotected and unguarded shafting, collar, bolts, or set screws in a negligent and unsafe condition without protecting or guarding the same, all contrary to the provisions of the laws of the state of Iowa.

That immediately south of the shafting, collar, and set screws or bolts referred to there is a narrow railway track on which cars are operated that carry brick from the conveyor to the drying rooms, and as the plaintiff was about to descend in the proper course of his duty on the south side of the shafting referred to, and in the usual, ordinary place therefor, through no fault or negligence of his, his left leg came in contact with one of said unprotected and projecting bolts or

set screws which was used for the purpose of holding the
collar described and fastening the same in said shafting, and
all of·which was unguarded and unprotected. That said un-
guarded and projecting bolt or set screw caught in the leg
of plaintiff's trousers, and drew the lower portion of plain-
tiff's left limb in and about said shafting, tearing the limb
a short distance above the ankle almost entirely from plain-
tiff's body, necessitating the amputation of said limb. That
in consequence plaintiff has been obliged to submit to three
operations at a point immediately below the, knee. Plaintiff ·
avers that he was free from negligence contributing to said
accident.

In its answer defendant states: That, when plaintiff
sought employment from defendant some sixty days prior to
the accident, he represented to defendant that he was an
experienced machinist, accustomed to working about and with
machinery and with men working at plants using various
kinds of machinery. That on the strength of such represent-
ations plaintiff was placed in charge of the rooms containing
the machinery, and especially the room or shed where he was
injured. That his duties consisted of overseeing said room
and machinery, and particularly the machinery therein, and
of seeing that the machinery was kept in proper condition
and order. That, if any machinery or set screws or other
parts of shafting were left unguarded in a condition danger-
ous to persons working about them, it was plaintiff's fault
alone, and not the fault of any one else, and that the matter
of covering and guarding the machinery complained of in
plaintiff's petition as causing the accident was a simple
matter, and required only a covering of simple material
which was at hand and could be had at any time by the
plaintiff, and that, if such machinery was unguarded and
was unprotected, it was wholly the plaintiff's fault, for which
he cannot be heard to complain. Defendant pleads that plain-
tiff assumed the risk, if any, which caused his injury, and
was guilty of contributory negligence.

II.  The charge of negligence submitted by the trial court to the jury was the alleged failure of the defendant to have a proper guard over the collar on the revolving shaft, by which the set screw and shaft would be covered, and this, with the issues of assumption of risk and contributory negligence, became the subject of inquiry.

1.  MASTER AND SERVANT: failure to guard machinery: negligence.

There is no controversy over the fact that the set screw on the collar of the revolving shaft was unguarded. Such condition was therefore one which the provisions of Code, Section 4999-a2, requires shall be protected against, by making it the duty of the owner or person in charge of such machinery to keep it properly guarded. A failure to meet such duty is negligence. *Kirchoff v. Supply Co.*, 148 Iowa, 508; *Bromberg v. Laundry Co.*, 134 Iowa, 38.

Stated correctly in its application to this case, the defendant claims that the character of plaintiff's employment and the services he was to render were such that he stood in the place of his principal as to all matters pertaining to the care of the machinery, and, occupying that position and being charged

2.  SAME: vice principal: evidence.

with such duty, he should not be permitted to recover for dangerous conditions which it was his duty to keep safe. It was left to the jury to determine as a question of fact the nature of plaintiff's employment and whether such duty rested upon him. It is claimed by the defendant that the evidence was such that the trial court erred in not directing a verdict for the defendant on this ground; and also that, because of the proof as to that relation between plaintiff and defendant and his resulting duty, the verdict is without support in the law.

The question thus presented requires a somewhat extended reference to the testimony. Prior to his coming to Sioux City, the plaintiff had been in various places as a worker about stationary engines. He had been employed by the American Smelting & Refining Company in Utah, starting

as oiler and assistant engineer, having two engines under his charge, and in the absence of the engineer he had charge of the whole plant. In the latter days of his employment by that company he was first assistant engineer. He was without practical experience as to the work in a brick-making plant. These facts are given as bearing upon his knowledge of machinery and the nature of his employment by the defendant, which had been arranged by plaintiff's half-brother, and upon which plaintiff came from the west to Sioux City. Upon his arrival he was introduced to Mr. Terrell, who he was told was foreman of the entire plant, and also that each department had a foreman of its own. Mr. Terrell's son had supervision of that part of the plant that made the brick, and a Mr. Mosler had supervision of them when taken to the kiln. Plaintiff testified that, when he came to the plant, the younger Terrell was let go, and plaintiff was expected to take his place as soon as he got acquainted with the work, having been employed for that purpose. His particular employment was to keep the time of the men, an account of the brick that were made, make report of these matters, and, as stated by him, to be as useful as he could around the plant, but he testified that he had no authority over the men. At times when it was needed he repaired the track and fixed the tunnels.

Defendant further testified in substance as follows:

I went to work for the Paving Brick Company April 10th. The accident occurred May 29th. I worked all the time between these dates. Every working day. I was in and about this room each day I worked. I became familiar to a certain extent during the weeks I worked there with the conditions about the room in which I worked. I knew it was a part of my duty to know the general condition of the track and the machinery, and of the tools that were in use there. This collar I have spoken of was uncovered at the time I went to work. I saw it many times a day. I did not observe before the accident whether or not the bolts that were used in this collar projected beyond the burrs. I was within a few inches or a few feet of this collar every day many times

a day, and its condition and location were perfectly familiar to me.  A man who is capable of acting as engineer, and has had the experience in that capacity that I have, had ought to know the general run of machinery.  I do not think there is anything about a simple shaft such as the one in operation at the time I was hurt that a man of my experience would not fully know and understand.  As a matter of fact, in a general way I did know and understand what there was in relation to that shaft, and the danger that might attend being around it.  I knew that, where there was an exposed collar on the shaft such as this one that injured me, it was liable to catch a man's trousers if he got too close to it, and thus hurt him.  I knew that when a man is working about a revolving shaft or a collar of this character, with loose trousers turned up at the bottom, they are liable to catch, and he is apt to get hurt if he gets close enough to the shaft.  If you get close enough for the projecting bolts to catch in your trousers you are going to get hurt.  I knew that.

In his employment plaintiff made regular reports as to the work in the department in which he was engaged, issued time checks to the men, and furnished information as to the work and the men, all of which reports were signed by him as foreman.  Concerning this plaintiff testified:

While at work out there I took my orders and instructions from Mr. Terrell.  I filled out the reports that were signed by me.  They had the printed word 'foreman' underneath. These were daily reports sent in to the main office in regard to how many brick was made.  There was also a daily report of the time of the men.  I kept the time of the men.  Mr. Fairchild explained to me that I was to get familiar with the work there, and that in case anything broke down, and I could help fix it, I was to help fix it.  Up to the time of the accident Mr. Fairchild never placed me in the position of foreman of the plant.  I never understood that I had any such duties of a foreman in connection with the plant.

William Stower, a witness for defendant, testified that he was employed in the plant for sixteen years prior and up to

the time of the accident, and since then had been inside fore-man, succeeding plaintiff, Wheeler. He further said:

Mr. Wheeler was inside foreman when I was there. The duties of the inside foreman are to keep all of the machinery in shape, and place the men where they can be of some advantage. He has to keep all of the time of these inside men, the hill gang and some of the car pushers on the outside. Mr. Wheeler performed the duties which I mentioned during the time he was there. There was no other inside foreman there during his time. J. Terrell had been foreman previous to Wheeler's coming. Mr. Wheeler and I spoke about the collar being uncovered. I could not say exactly when it was. It was somewhere around three weeks before the accident. We just happened to be standing there alongside of it, and I happened to speak of it. He said we will have to get at it and cover this collar. I did not say anything in reply. There was nothing further done at that time or subsequently with reference to covering it.

G. N. Fairchild, president of the defendant company, testified that the arrangements for the employment of the plaintiff were made through one Wiringer, a step-brother with whom the general nature of the employment was dis-cussed, and that plaintiff, if employed,

Was to have charge of the inside machinery of the plant and be foreman over the men in that department, to keep the time for the men in his department, and also in the hill, in the clay bank. We paid him $80 per month, higher wages than were paid to an ordinary workman. It was Wheeler's duty in that department to see that the machinery was kept in proper condition and in regular order, and to do what might be necessary to keep it so. There was no one else in authority in that matter outside of the general superintendent. I did not give any personal attention to the condition of this collar on the shaft. I know that sheet steel was used to make the covering for a collar such as that. The material was there, and might have been procured by Mr. Wheeler at any time for that use. I never heard Mr. Wheeler complain to any person, myself included, regarding the danger of this

uncovered collar or of his inability to get material to make
it safe. He never said anything at all about it. (On cross-
examination this witness said:) Mr. Wheeler had something
like forty or forty-five men to look after. Some of them were
out in the clay pit. They would run from seven to ten men
right in that room where this table is situated. Deno merely
oiled the machinery at stated times. Stower was the general
repair man.

Frank Terrell, superintendent of the plant, testified:

It was my duty to see that everything was working
right. I had charge yet. There were three departments,
each having a foreman. My son, J. Terrell, was foreman
inside. He quit, and Wheeler took his place. My son had
charge of the machinery as well as the men. These foremen
were subject to my orders. When Wheeler went to work,
he took the same duties that my son had performed. I
ordered him to do so when he came. My son stayed there
with him three or four days after Wheeler had gone in there.
I told Wheeler that my son would show him what there was
to do; that is all the instructions I gave him at the time. I
left him with my son. For the first two weeks after my
son left I was in that part of the plant pretty often. I
wanted to see that everything was all right; and, if anything
was wrong, I would tell Wheeler about it. I was told that
he had not had practical experience in the making of brick.
After he had been there a week or two, I did not go in so
often as he was handling the business so that it was not
necessary.

Henry G. Wiringer, step-brother of plaintiff, arranged
with Mr. Fairchild, the superintendent, for the employment
of plaintiff. He testified that nothing was said about
Wheeler's duties; that he was to go out and get acquainted
with the work. Mr. Fairchild contemplated enlarging his
Sioux City and another plant, and was looking for a man who
could fill the position of general superintendent of both
plants; understood that his brother was only at the plant on
trial, occupying a subordinate position.

We have given the substance of all the testimony which has any direct bearing upon the nature of plaintiff's employment, and now direct our inquiry to the question whether it was such as to require a holding by the lower court that it was an affirmative duty resting on plaintiff as "one having charge of . . . an establishment where machinery is used" to see that it was protected as required by Code, Section 4999-a2. As will be noted from a reading of the evidence above set out, there was presented the claim on the part of the plaintiff that while the nature of his employment was such that both parties expected that, if shown to be qualified, he was to become foreman, there is evidence tending to support his claim that he had not been placed in full charge, and although performing many of the duties required of a foreman was yet on trial. It is true that he made reports upon blanks furnished for that purpose, signing them above the word "foreman" printed upon the form, but that is not conclusive as to his relation and duty, although it was a fact which had bearing upon the question. Plaintiff testified that he had not yet been placed in full charge. His step-brother, by whom the employment was arranged, with Mr. Fairchild, testified as to the understanding that plaintiff was to work for a time and demonstrate his fitness before he should be placed in full charge. The testimony of Fairchild, Terrell, and Stower, while tending to show a different arrangement, and that the plaintiff was in full charge, in some respects corroborates the plaintiff. While the defendant would not be concluded by plaintiff's statement as to what he understood his duties to be, especially if he did in fact assume and discharge the duties of foreman, yet, if the defendant knew or had reason to believe that plaintiff did not yet consider that he had been placed in full charge, then its obligation to keep its machinery in safe condition was not delegated to him.

As to this ultimate question, as we have noted, there was a dispute in fact, which the trial court properly submitted to the jury.

III. It is next contended that plaintiff assumed the risk incident to his employment. Chapter 219, Acts 33d General Assembly, is as follows:

That in all cases where the . . . machinery . . . of an employer (are) is defective or out of repair, and where it is the duty of the employer from the character of the . . . machinery . . . to furnish reasonably safe machinery . . . the employee shall not be deemed to have assumed the risk . . . growing out of any defect as aforesaid, of which the employee may have had knowledge when the employer had knowledge of such defect, except when in the usual and ordinary course of his employment it is the duty of such employee to make the repairs, or remedy the defects. Nor shall the employee under such conditions be deemed to have waived the negligence, if any, unless the danger be imminent and to such extent that a reasonably prudent person would not have continued in the prosecution of the work; but this statute shall not be construed so as to include such risks as are incident to the employment.

It is claimed by the defendant that in four respects the statute is without protective application to plaintiff.

First. That it was the duty of plaintiff in the ordinary course of his employment to make the repairs. This proposition has been considered in the preceding division of this opinion, leaving it as a question to be determined by the jury.

Second. That the risk was incident to his employment. We are not disposed to the view that it was the intent of the Legislature in exempting from the provisions of the quoted statute such risks as are incident to the employment to thereby leave unchanged the law as it was prior to the enactment of chapter 219; nor can it be construed as repealing by implication any of the provisions of Code, Section 4999-a2. The particular language upon which defendant's second point is based evidently was intended to exempt a master from liability for such damages and possible injuries as might re-

3. SAME: assumption of risk: statute: repeal by implication.

sult to the servant in an employment essentially hazardous in itself, independent of the mechanical means by which such work would be done, which might not be inherently, but only casually, dangerous; but could not fairly nor reasonably be construed to carry the exemption to that which the law expressly declares to be an affirmative and continuing duty on the part of the master. The risk which plaintiff encountered, and which resulted in his injury, arose, not out of the general nature of his employment in the particular work and at the particular place, but from an unsafe condition of one of the mechanical agencies used in carrying on the work. Giving effect to the statute imposing the duty upon the master in the light of the evident purpose of the Legislature in the enactment of chapter 219, we are clear that, unless it were the duty of plaintiff himself to have made the repairs, he could not be held to have assumed the risk as an incident to his employment.

Third. That the evidence fails to show that defendant had knowledge of the defect. The particular condition of which complaint is made had been open and apparent for a long time prior to the accident. It had been 4. SAME: knowledge of danger: presumption. the subject of mention between Stower and Wheeler. There was evidence tending to show that it was the duty of the former to keep the machinery in proper condition. If so, his knowledge of the dangerous condition was the knowledge of the defendant. But, even if it were not his duty, it devolved upon some one by reasonable inspection to know the condition of the shaft and guard it; and, when as in the present case the condition was apparent for so long a time that in the exercise of reasonable care and observation it might have been known by the master from such facts, knowledge may be presumed. The evidence warrants a finding that defendant had knowledge of the condition.

Fourth. That the danger encountered by plaintiff in what he was doing immediately preceding the accident, in view of his knowledge of the exposed set screws and turning shaft or

rod, was imminent and to such an extent that a reasonably prudent person would not have continued in the prosecution of the work. This proposition is so blended with that of contributory negligence, upon which defendant also relies, that we will consider it in that connection.

IV.  In plaintiff's petition, the substance of which is given at the opening of this opinion, is a description of the machine or that part of it which is claimed to have been dangerous and unguarded.  To aid in a better understanding of the claim that plaintiff's negligence contributed to his injury, we deem it necessary to more particularly describe the machine and its surroundings:

5. SAME: contributory negligence: evidence.

In the plant there is a 'conveyor table,' which runs east and west, and on which a continuous stream of green pressed clay, the width and thickness of ordinary brick, travels by means of a conveyor belt westerly to a point, where it is cut into the proper lengths by wire strands attached to the arms of a wheel.  After passing this wire cutter, the brick continues to travel along the table still farther west, where they are picked off by men and placed on cars immediately south of the conveyor table.  When a car is loaded, it is pushed east on a track past the point where plaintiff was injured to what is known as a transfer track, thence into the burning or drying kilns.  The east and west track parallels the conveyor table with the north rail about twenty-eight inches from the shaft that caught plaintiff.  The car projects about four inches over the rail, which would leave a space between the revolving shaft and a moving car of twenty-four inches.

Movements of cars over this track were as frequent as was necessary to remove the brick, when cut, to the kiln for burning.

Plaintiff's description of the happening of the accident and of his conduct immediately preceding it, is as follows:

My accident occurred about 7:30 or between 7:30 and

8 o'clock in the morning. The morning of the accident, as I passed this machine, there was a wire broken on the machine; and, in order to keep things going, I went over the machine and shut it off and fixed this wire, and as soon as I had it fixed I started up the machine and came back over the machine to go outside to do something, and in coming down I put one knee on each side of this belt of the conveyor, and then I brought my right knee on the inside and the left knee on the outside, and I brought my right foot down and put it on that I-beam close to the ground, and in bringing my left foot down I looked around to see if there was a car coming, because I intended to cross the track, and in doing that I looked around and I got my leg too close to the shaft. If I hadn't put my foot on the ground, and hadn't looked for the car, I would have been all right. I heard a car coming at the time I looked. I looked down there before I put my foot on the I-beam, and knew what I was doing, where I was placing it. My right foot was to the right of the collar. I knew that the shaft was revolving at the time, and I knew that collar was there exposed. I had seen it there every day during the days I had been working there and many times each day. I knew that bolts projected to some extent beyond the surface of the collar. It was my idea when I put my right foot on the I-beam that I was going to stretch clear across and put my left foot on the ground between the shaft and the track. The shaft is two and a half feet from the top of the table. At the time I was upon the table and before attempting to get down I knew, of course, that cars were liable to be moving at that particular time. I don't remember putting my left foot down on the I-beam. As I brought it down, I looked to see if the car was coming (from the west on the transfer track), and it got caught, but where my foot was when it got caught I don't know. All I know is what I intended to do.

In his cross-examination plaintiff testified as follows:

Q. You knew you was bringing your foot down there very close to that exposed collar? A. I had it plenty far enough away from it. Q. Just a mere glance was all you needed to give to see if that car was coming. A. Yes, sir, and as I did that I got caught. Q. Do you mean to say although you

knew perfectly well the condition of this collar, and that your right foot was within a few inches of that, that simply turning your head that you might glance up the track took your attention away from the collar so that you got caught? A. I must have. Q. I ask you whether as a matter of fact, testifying under oath, whether the glance you gave up this track was sufficient to cause you to put your foot on this collar where the collar might reach you? A. I did, or I wouldn't have got caught. Q. I ask you if as a matter of fact, when you came to get off the table that morning, you were thinking of this knuckle and its exposed condition at the time you put your foot down on this beam, and, when you attempted to step over the knuckle with your left foot, did you have that in mind? A. Yes, sir. Q. You knew it was a dangerous thing to do, and it might catch you unless you was careful? A. Yes, sir; there was a chance of getting hurt. I don't think there was anything about a simple shaft such as the one in operation at the time I was hurt that a man of my experience would not fully know and understand. As a matter of fact, in a general way, I did know and understand what there was in relation to that shaft and the danger that might attend being around it. I know that, where there was an exposed collar on the shaft such as. this one that injured me, it was liable to catch a man's trousers if he got too close to it, and thus hurt him. I know that, when a man is working about a revolving shaft or collar of this character with loose trousers turned up at the bottom, they are liable to catch, and he is apt to get hurt if he gets close enough to the shaft. If you get close enough for the projecting bolts to catch in your trousers, you are going to get hurt. I knew that. I wasn't exposing myself. I was all right if I hadn't looked up to see, if a car was coming. I was in the clear.

It was shown that the place where plaintiff was crossing was the usual place for getting over the table, although on a part of the casting of the machine or conveyor table there was a projection which afforded a safe means of getting over, and away from the exposed knuckle and set screw; also, that there was a safe way around the table, by which crossing it could be avoided, and that plaintiff was familiar with the surroundings.

That the rule of contributory negligence is applicable to cases arising under the Factory Act (Code Supp. 4999-A2), we have recently held in *Verlin v. U. S. Gypsum Co:*, 154 Iowa, 723; *Stephenson v. Brick Co.*, 151 Iowa, 376. We therefore pass to the inquiry whether under the facts as shown in the record the plaintiff was as a matter of law guilty of such negligence as must defeat recovery. The evidence tends to show that the plaintiff was crossing at the place where such was usually and ordinarily done by the employees as the demands upon them might require such action. There was an element of danger involved in so doing when the shaft was revolving, and this plaintiff testifies was recognized and fully understood by him, but it is further testified by him that by exercising ordinary care in placing his feet danger could be avoided, and this he asserts he was doing up to the moment when his attention was diverted by what he thought to be the approach of a car on the tracks over which he was at the time crossing. Assuming the place to have been a dangerous one, involving apparent risk, and that there was another place which afforded a safe means of getting across, it does not necessary follow that in adopting the more hazardous one the plaintiff was negligent as a matter of law, if there was reason to believe that the act could be safely done in exercising ordinary care.

"Ordinarily the question of negligence in adopting a dangerous way of accomplishing a task when a safe way is open is one of fact for the jury, as well as whether the person 6. SAME. used ordinary care to protect himself from injury:" *Gibson v. Railway Co.*, 107 Iowa, 596; *Norris v. Cudahy Packing Co.*, 124 Iowa, 748; *Stephenson v. Brick Co., supra;* Bailey on Injuries, page 472. The manner in which plaintiff's accident happened was such that, but for the claim of diverted attention, it would fairly follow that with his knowledge of the situation and so placing his foot and leg that his trousers were caught by the revolving

knuckle and set screw, he did not as a matter of law act with reasonable care. There is, however, to be considered the further condition as given in his testimony that while, as he says, he was making the crossing and exercising such care that he would have avoided injury, his attention was temporarily diverted by what he thought was the approach of a car, and which unless avoided would have been a source of danger to him. Whether a car was in fact coming is not clearly shown; but it was left to the jury under proper instructions to determine whether plaintiff's attention was momentarily diverted, and the record was such as to warrant the submission of that question, if the other facts were such that a verdict should not have been directed for defendant.

The authorities generally are to the effect that one whose attention is diverted is not to be held to the same closeness of observation as he would otherwise be; and where his act, but for such diverted attention, would have been negligent, upon proof tending to show conditions throwing him off his guard, the question of his negligence is one for the jury. *Taylor v. Wabash Ry. Co.*, 112 Iowa, 160, and cases cited; *Lorenz v. B., C. & N. Ry. Co.*, 115 Iowa, 377; *Marnan v. C., R. I. & P. Ry. Co.*, 156 Iowa, 457. The case of *Miller v. Monument Co.*, 141 Iowa, 701, cited by the appellant, rested upon the fact that the employe while knowing of a dangerous condition in the floor where he was working forgot it, and received injury. There is a clear distinction between forgetfulness which, unless there are circumstances that excuse it, is one phase of negligence, and a sudden arising of conditions which throw one off his guard, and for the moment without fault on his part divert his attention from a danger not forgotten, but guarded against. We think the rule of the cited case is not applicable nor in contradiction of the cases above referred to.

V. It is further contended by the appellant that in the particular act which had engaged the plaintiff just pre-

ceding his accident, that of fixing the broken wire, he was a
mere volunteer outside of his employment,
and that defendant owed him no duty to keep
the machinery guarded. The rule as to the exemption of a
master from liability to injuries to a mere volunteer, and
upon which, as a general statement, the authorities are
agreed, does not we think find application here. The em-
ployment of plaintiff was of a general nature, not confined to
any particular duty, but for the purpose among other things
of giving care to matters requiring prompt attention that the
work might not be delayed. Such was entirely consistent
with a finding by the jury that he was not in charge of the
machinery.

7. SAME:
volunteers.

Acting in an emergency to meet a condition requiring
attention and which is necessary to be remedied before the
work can proceed, does not constitute one a volunteer, unless
it appears, as it does not in this case, that that which was
done by him was the special duty of another.

VI. Several instructions given by the trial court are
criticised and urged as error; also error is charged in refus-
ing to give instructions requested by defendant. We have
considered the instructions given and refused. Without set-
ting them out or discussing them more in detail, it is suffi-
cient to say that the instructions given are in harmony with
the law which we find to be applicable to the facts in this
case, and are not erroneous. The instructions offered by the
defendant presented a theory of the case indicated by its
allegations of error as considered in this opinion, and which
we think cannot be upheld. We find no error arising on the
trial.

VII. The jury rendered a verdict in favor of plaintiff in
the sum of $10,000. This is urged to be excessive, and as
resulting from passion and prejudice. At the time of his
injury plaintiff was thirty-eight years old,
and according to the life tables had an ex-
pectancy of almost thirty years. Prior to his
injury he had been in good health, with capabilities fitting

8. SAME: dam-
ages: exces-
sive verdict.

him for other than common labor. He earned from $80 to $90 per month. The injury was of such nature as to cause much suffering, and different operations. Amputation was below the knee.

There is no fixed standard of compensation applicable to cases of this character, although as a basis of recovery the jury should consider among other things the extent to which earning capacity has been impaired by the injury. Taking into consideration the extent of plaintiff's injury, with the knowledge common to all that it disqualifies him only in part if at all from the work for which he is qualified, that of stationary engineer, and making due allowance for expenses incurred by him because of the injury, and for the other elements of damage common to cases of this nature, we feel that a judgment of $10,000 is excessive, and should be reduced. If therefore plaintiff, appellee, shall within sixty days from the filing of this opinion elect to file in this court a remittitur of all above $8,000 of the verdict and judgment, then the judgment for that amount will be affirmed, with costs. Otherwise the judgment of the lower court will be reversed.—*Affirmed* on condition.

GAYNOR J., took no part.