## Cincinnati, New Orleans & Texas Pacific Railway Company v. Goldston.

(Decided December 12, 1913).

### Appeal from Boyle Circuit Court.

1. Personal Injuries—Negligence—Suit Under Federal Employers' Liability Act.—In a suit under the Federal Employers' Liability Act, it is necessary for the plaintiff to show that the employees of the defendant were guilty of the negligence which caused the injury complained of.

2. Personal Injuries—Negligence—Instructions.—Where, in a suit for damages for personal injury, the plaintiff relied upon two acts of negligence, it was error for the court in one instruction to instruct the jury as to the defendant's liability if it committed the first act of negligence, and in a second instruction

to instruct the jury as to the defendant's liability under both acts of negligence, and giving a right to recover, if either act was proved.

3. Railroads—Negligence.—The fact that there was a sudden or even a hard jerk of a freight train by the engine, does not prove that the engineer was negligent; in such cases negligence arises only where the jerk was violent, unusual and unnecessary.

4. Master and Servant—Assumption of Risk.—Assumption of risk is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk.

5. Master and Servant—Assumption of Risk.—The doctrine of assumption of risk is distinct from that of contributory negligence, and rests upon the agreement of the servant with his master, express or implied from the circumstances of his employment, that his master shall not be liable for any injury incident to the service, resulting from a known or obvious danger arising in the performance of the service.

6. Assumption of Risk.—Where assumption of risk is pleaded as a defense, and there is evidence to support it, it is error for the court to refuse to give an instruction upon that subject, when asked to do so by the defendant.

CHARLES H. RODES, NELSON D. RODES and JOHN GALVIN for appellant.

ROBERT HARDING, JOHN W. RAWLINGS and EMMET PURYEAR for appellee.

Opinion of the Court by Judge Miller—Reversing.

The appellee Goldston was injured on August 10, 1911, while in the service of the appellant as the conductor of a freight train. The train, consisting of 33 cars was standing on the side-track No. 3 in the yards of the appellant in Danville, about five o'clock in the afternoon, ready to depart upon its trip to Oakdale, Tennessee. The engine was within about one car length of the switch which connects the side-track with the "lead" track, which leads into several parallel side-tracks west of the southbound main track.

From the point where side-track No. 3 entered the "lead" track, to the point where the "lead" track joins the southbound track, is a distance of about ten car lengths. The caboose, which was on the rear end of the train, was a box car caboose, made from what was originally an ordinary box car. The caboose had a door at each end, and also a door in the middle of each of its

sides; and under these side doors there was a step of wood and iron eight or ten inches broad, and about six feet long, while there was attached to the caboose, on each side of the two doors, an iron rod known as a "grab iron." The steps and grab irons were for the use of the trainmen in boarding the caboose.

The train crew consisted of Goldston, conductor; Nichols, engineer; Palmer, fireman; and Litton and Singleton, head brakeman and rear brakeman, respectively.

A few minutes before the train started, Nichols, the engineer, climbed down from his engine cab and walked back along the east side of the train a few car lengths, where he met Goldston, who gave Nichols the train orders and clearance card, and saying that he would catch the caboose. Nichols testified that Goldston also said he was ready to start; but Goldston denied this. Nichols immediately walked back to his engine, mounted it, waited a few moments, and then gave two short blasts of the whistle, and began to slowly move the train out of the side-track. Goldston says he was about twelve or fifteen car lengths from the caboose when the train began to move; that he walked back toward the caboose, and when he met it the train was moving at the rate of about six miles an hour; that he took firm hold of the two grab irons beside the eastern door of the caboose, and planted both feet firmly on the foot-board below the door sill; that he had ridden in that position for about thirty seconds, when the caboose gave a lunge forward and the step gave way with him, throwing him off the caboose and under the wheels, which ran over his right leg, crushing it in such a manner that amputation was necessary.

The caboose carried Silvers, an engineer upon appellant's road; Preston and Hammer, switchmen in appellant's service, who were on their way to other points on the road, and rear brakeman Singleton. Preston and Hammer had boarded the caboose by the step and door on its west side, while Singleton had used the step on the east side.

Singleton, who was standing in the doorway of the caboose watching Goldston while the caboose was approaching him, says Goldston attempted to board the caboose; that he reached for the grab irons with his hands—may have touched them, but did not get a solid hold—and just then the caboose gave the jerk which usually results from taking up the slack in a freight train; that Goldston's feet were not planted on the foot-

board, though they may have touched it in his attempt to get on the moving caboose, and that he fell on his left side.  The other three men who were sitting in the caboose testified, in substance, that they were in positions to see the east door of the caboose, but that they did not see Goldston standing on the step in front of the door; and they further stated that the jerk of the train was the usual and ordinary jerk similar to that experienced by them every day on a railroad train.

Nichols, the engineer, says that after he had given two short blasts of the whistle, he opened the throttle of the engine from one-sixteenth to one-eighth of an inch, which caused the train to gradually move out from the side-track on to the "lead" track, and that after he had proceeded about four car lengths, he shut off the steam by closing the throttle.  The track was slightly down-grade, and the train rolled at the rate of about six miles an hour through the "lead" track and out on to the southbound main track.  The engine being heavier than any freight car, it did not roll as fast as the freight cars; and they consequently pressed forward, bunching the slack in the couplers forward toward the engine.  When the engine had proceeded about four car lengths on the main line, the engineer again opened the throttle from one-sixteenth to one-eighth of an inch, which caused the engine to go forward a little more rapidly than it had been proceeding, and necessarily pulled the slack out of the train which had been bunched forward, and caused the cars to successively jerk forward one after the other.  It was this jerk that the caboose received when Goldston was injured, and about which Goldston and the men in the caboose testified, as above recited.

Appellant's rule 119 provided that a train must not start without a signal from the conductor, and Goldston testified that Nichols started the train without a signal; and further, that it was Nichols' duty, after the entire train had passed through the switch and on to the main track, not to proceed upon the journey to Oakdale until he had received a signal to do so, from Goldston. Usually, the train would be required to stop after it had reached the main track in order for the rear brakeman to close the switch and board his train; but occasionally some other employee would close the switch, and upon the signal being given, the engineer would proceed upon his journey without bringing his train to a full stop.  In this instance Nichols says that when the engine had gone about four car lengths upon the main track he received

the "high-ball" signal from Litton, which meant that the train could proceed without stopping; and that he then opened the throttle slowly, as above stated, pulling the slack out of the train, and causing the jerk complained of. Litton denies that he gave Nichols the "high-ball" signal, although both Nichols and Palmer, the fireman, say he gave it.

The acts of negligence, however, upon which appellee relied, were the defective step and the alleged violent, unusual and unnecessary jerk of the train after the engine had gotten out on the main track.

The action was brought under the Federal Employers' Liability Act, and under that act it is necessary for the plaintiff to show that the employees of the defendant were guilty of negligence which caused the injury complained of. Helm v. C., N. O. & T. P. Ry. Co., 156 Ky., 240.

As acts of negligence upon the part of the appellant, the petition alleged the defective condition of the step on the caboose, and the sudden and unusual jerk of the train which threw him under the wheels of the caboose. The answer joined issues upon these allegations, and relied affirmatively upon the contributory negligence of Goldston, and his assumption of the risk, in bar of a recovery.

Goldston recovered a verdict and judgment for $9,000.00, and the company appeals.

First, it is insisted that the first and second instructions were erroneous. They read as follows:

1. "If you believe from the evidence that the defendant company's engineer in charge of the freight train, while any portion of it was on the side-track in the yards, and before all of said train had come onto the main track, negligently, or without receiving a signal from the conductor or brakeman, Litton, to do so, caused said train to go forward with the purpose and intention of leaving the yards on its route to Oakdale, with a quick and violent and sudden and unusual movement, and thereby caused the plaintiff to be thrown from the foot-board of the caboose and injured his leg, you will find for the plaintiff under this instruction, and if you do not so believe from the evidence, you will find for the defendant under this instruction."

2. "If you believe from the evidence that the defendant company's foot-board on its caboose was in a loose, or defective, and unsafe condition, and the plaintiff did not know, or by the use of ordinary care could

not have known of such condition, and the defendant company knew, or by the use of ordinary care could have known, of said condition, and you further believe from the evidence that the plaintiff got upon said foot-board while the same was in said condition for the purpose of discharging the duties required of him by the defendant company, and while so engaged the defendant company's engineer in charge of the freight train negligently caused said train and caboose to go forward with a quick and violent and sudden movement, which was unusual or unnecessary, and because of said condition of said caboose and such movement of said train and caboose, or either, the plaintiff was thrown from the foot-board of the caboose, and his leg was injured, you will find a verdict for the plaintiff under this instruction, and if you do not so believe from the evidence, you will find a verdict for the defendant company under this instruction."

The first instruction does not base appellee's right to recover solely upon the appellant's negligence in causing a violent, unusual and unnecessary jerk in starting the train, but couples with that act of negligence the further question whether the engineer disobeyed orders in starting on his trip before he received a signal to do so. The question being whether the jerk was of a violent, unusual and unnecessary character, it is unimportant why it was occasioned, or what was the purpose and intention of the engineer in causing it. The appellee was not injured by reason of any failure of the engineer to give him notice of the starting of the train, but by the alleged negligence of the engineer in jerking the train, as it is claimed, in a violent, unusual and unnecessary manner. The first instruction was erroneous in submitting to the jury, as it did, extraneous questions about the signal, and the purpose and intent of Nichols in starting on his trip.

Moreover, in describing the negligent movement of the train the instruction should have used the terms "violent, unusual and unnecessary," which are commonly used in such instructions, instead of the terms "quick and violent and sudden and unusual." A jerk in the operation of a heavy freight train might be violent, and nevertheless necessary and usual in such operation.

In Yates v. Miller Creek Construction Co., 28 Ky. L. R., 332, 89 S. W., 241, where it was sought to hold the company liable for the negligence of its engineer in sud-

denly and violently starting or increasing the speed of the train, as here, we said:

"The fact that there was a sudden or even hard jerk of the tenders by the engine does not prove that the engineer or fireman was negligent. The only witness professing to know what caused the jerk was Cotton, and he explained that it was caused by the opening of the throttle. Not being an expert he was unable to tell whether the opening of the throttle was or not at the time necessary. All he could say about it was 'the jerking was caused by the throttle being opened starting the train again. I do not know how wide the same was opened, but it started the train with a jerk.'

"The proof wholly failed to show that the jerk which threw appellant from the tender was not such as usually attends the movements of such a train, or that it was of unusual force, or was caused by any unnecessary force applied to the train through the engine or in the manner of operating it."

The above language was approved in L. & N. R. R. Co. v. Greenwell's Admr., 125 S. W., 1056.

The second instruction authorized a recovery if either the jerk of the train or the defective step caused Goldston's injury. The first instruction had, however, submitted the question of the company's liability if the jerk was violent, unusual or unnecessary; and that being true, this instruction should have been confined to the question of the appellant's negligence in furnishing the alleged defective step. In giving the first instruction upon one act of negligence, and by repeating it in conjunction with the other act of negligence in the second instruction, in which the jury was told it could find for plaintiff if either ground existed, there was a tendency to confuse the jury, which could have been avoided by a separate and distinct instruction upon each phase of the case, or by a single instruction presenting both phases.

Moreover, in departing from the usual instruction approved in such cases, that the jerk must have been "quick and violent and sudden," instead of "violent, unusual and unnecessary," the court erred as above pointed out.

The court gave an instruction upon contributory negligence; and in accordance with its plea, appellant asked an instruction upon the subject of Goldston's assumption of risk, but the court refused to so instruct. This in-

struction was offered under a plea of assumed risk specifically set up in the answer.

The defenses of assumed risk and contributory negligence have been quite frequently confused, or treated as interchangeable, in some of the older cases. But that these defenses are distinct has been asserted in many of the more recent opinions which are collected in the Note in 18 Ann. Cases, 960, and in Narramore v. C. C. C. & St. L. R. Co., 96 Fed., 298; 37 C. C. A., 499; 48 L. R. A., 68.

In the Narramore case, *supra,* decided in 1899, the U. S. Circuit Court of Appeals, speaking through Judge Taft, said:

"Assumption of risk is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk. In such cases the acquiescence of the servant in the conduct of the master does not defeat a right of action on the ground that the servant causes or contributes to cause the injury to himself; but the correct statement is that no right of action arises in favor of the servant at all, for, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers the risk of which he agreed expressly or impliedly to assume. The master is not, therefore, guilty of actionable negligence toward the servant. This is the most reasonable explanation of the doctrine of assumption of risk, and is well supported by the judgment of Lord Justices Bowen and Fry in the case of Thomas v. Quartermaine, L. R. 18 Q. B. D., 685, 695. See also language of Lord Watson in Smith v. Baker (1891) A. C., 325, and O'Maley v. South Boston Gaslight Co., 158 Mass., 135, 32 N. E., 1119. It makes logical that most frequent exception to the application of doctrine by which the employee who notifies his master of a defect in the machinery or place of work, and remains in the service on a promise of repair, has a right of action if injury results from the defect while he is waiting for the repair of the defect, and has reasonable ground to expect it. Hough v. Texas & P. R. Co., 100 U. S., 213, 25 L. Ed., 612; Northern P. R. Co. v. Babcock, 154 U. S., 190, 38 L. Ed., 958, 14 Sup. Ct., 978; Snow v. Housatonic R. Co., 8 Allen, 441, 85 Am. Dec., 720; Gardner v. Michigan C. R. Co., 150 U. S., 349, 37 L. Ed., 1107, 14 Sup. Ct. Rep., 140.

"From the notice and the promise is properly implied the agreement by the master that he will assume the risk of injury pending the making of the repair."

In the late case of Miller v. White Bronze Monument Co., 141 Iowa, 701, 18 Ann. Cases, 960, the Iowa Supreme Court pointed out the distinction as follows:

"It is well in this connection, perhaps, to discriminate between assumption of risk and contributory negligence. 'Assumption of risk' is in effect a waiver of defects and dangers, and a consent on the part of the employee to assume them, no matter whether he be careful or negligent in his conduct. This consent is held to take away the injurious character of defendant's act, and is bottomed on the old maxim, *volenti non fit injuria* —that to which a party assents is no wrong. In such cases the injured party may at the time be in the exercise of all the care which the law requires, and still have no right of recovery. This is clearly pointed out in the old case of Thomas v. Quartermaine, 18 Q. B. D. (Eng.), 697. Of course, facts showing contributory negligence may also prove assumption of risk; but rarely, if at all, will proof that one did not assume a risk also show that at a given time he was in the exercise of ordinary prudence for his own safety. These distinctions have not always been observed, but they are essential to a proper application of the facts to a given case. See Fitzgerald v. Connecticut River Paper Co., 155 Mass., 155, 29 N. E., 464, 31 Am. St. Rep., 537; Dempsey v. Sawyer, 95 Me., 295, 49 Atl., 1035; Chicago, Etc., R., Co. v. Heerey, 203 Ill., 492, 68 N. E., 74; Narramore v. Cleveland, Etc., R. Co., 96 Fed., 298, 37 C. C. A., 499, 48 L. R. A., 68: D. H. Davis Coal Co. v. Pollard, 158 Ind., 607, 62 N. E., 492, 92 Am. St. Rep., 319. As said in the last case, assumption (713) of risk is a matter of contract, express or implied; while contributory negligence is a matter of conduct."

The rule is formulated as follows, in 26 Cyc., 1177: "While a servant does not assume the extraordinary and unusual risks of the employment, the rule is well settled both in England and in this country that on accepting employment he does assume all the ordinary and usual risks and perils incident thereto, whether it be dangerous or otherwise, and also all risks which he knows, or may, in the exercise of reasonable care, know, to exist, unless there is some agreement to the contrary. He does not, however, assume such risks as are created by the master's negligence, nor such as are latent, or are only discovered at the time of the injury. The doc-

trine of assumption of risk is distinct from that of contributory negligence, and rests upon an agreement of the servant with his master, express or implied, from the circumstances of his employment, that his master shall not be liable for any injury incident to the service, resulting from a known or obvious danger arising in the performance of the service.''

This rule is recognized in this State. Kentucky Freestone Co. v. McGee, 118 Ky., 306; C., N. O. & T. P. Ry. Co. v. Evans' Admr., 129 Ky., 165; Lexington Railway Co. v. Cropper, 142 Ky., 42.

While there was some evidence in the case at bar tending to show that the jerk of the train was unusual, unnecessary, and so violent as to show a want of ordinary care upon the part of the appellant's employees, there was more evidence tending to show that the jerk was only the usual jerk that necessarily accompanies the movement of trains. If the jerk was only an ordinary jerk, we think the appellant was, under a plea of assumed risk, entitled to an instruction upon that subject. This question was before the court in C., N. O. & T. P. Ry. Co. v. Evans' Admr., 129 Ky., 165, where we said:

''Evans, when he entered the service of the railroad company as a brakeman, assumed all the risks of the employment as usually conducted, including the negligence of his fellow-brakeman, and such jerks of the cars as result from the taking up of the slack in the movements of the cars made with ordinary care by the engineer. The instructions given on the trial do not sufficiently present the defendant's side of the case.''

There being evidence to support this defense, the court should have given an instruction covering it.

It is also insisted that the action should be reversed on account of the misconduct of appellee's counsel in his closing argument to the jury. As the case, however, will have to be reversed upon the points above indicated, and the alleged misconduct is not likely to be repeated, it is not necessary to now pass upon it.

For the errors above indicated the judgment is reversed for a new trial.