WALTER M. MATTHEWS

*v.*

CUMBERLAND AND ALLEGHENY GAS COMPANY

(No. 10541)

Submitted April 28, 1953. Decided July 15, 1953.

*Charles C. Wise, Jr., Keith Cunningham, U. G. Young, Jr.,* for plaintiff in error.

*David D. Johnson,* and *John C. Morrison, John F. Brown, Sr.,* for defendant in error.

HAYMOND, PRESIDENT:

In this action of trespass on the case, instituted in the Circuit Court of Randolph County, the plaintiff, Walter M. Matthews, obtained a verdict for $30,000.00 against the defendant, Cumberland and Allegheny Gas Company, for personal injuries sustained by him as a result of the alleged negligence of the defendant. At the conclusion of the evidence offered in behalf of the plaintiff, and at the conclusion of all the evidence, the defendant made separate motions for a directed verdict in its favor. These motions and a motion of the defendant to set aside the verdict and grant it a new trial were overruled and on July 9, 1952, judgment was rendered upon the verdict in favor of the plaintiff with interest and costs. To that judgment the defendant prosecutes this writ of error in this Court.

The injuries of which the plaintiff complains, which are serious and apparently permanent in character, were sustained by him on a public highway in Upshur County on October 17, 1950, when, in an effort to avoid injury from a rubber hose used by the defendant in purging its nearby high pressure gas service line of air, water and dirt, a collision between the plaintiff and an automobile driven by a third person occurred and which injuries, the plaintiff charges, were caused by the negligence of the defendant in conducting its operation of purging its pipe line.

On and prior to October 17, 1950, the defendant owned and operated a four inch high pressure pipe line between Weston, Lewis County, and Buckhannon, Upshur County, for the transmission of natural gas for delivery to the residents of Buckhannon and other persons who purchased and used its gas. The pipe line was constructed and laid beneath the surface of the land through which it passed and, at and near the place where the plaintiff

was injured, it was located parallel to and about fifteen feet north of the northern edge of the improved portion of a public highway designated as U. S. Route No. 119 a section of which, in a generally east to west direction, extends from Buckhannon to Weston. In the locality in which the plaintiff was injured, which is about one half mile west of Buckhannon, the paved surface of the road of concrete construction is sixteen feet in width and the berm on the north side of the concrete is approximately seven and one half feet in width. The distance between the northern edge of the berm and the location of the pipe line is also approximately seven and one half feet and at the edge of the berm and between it and the pipe line is a small ditch which extends east and west and parallel with the road. On the edge of the north berm opposite the point in the highway where plaintiff was struck by the automobile is a mail box which is located between the residence of a man named Haskins to the west and the residence of a man named Peterson to the east. The open space between these dwellings is approximately eighty four feet in width and extends from and north of the road for a distance of at least ninety feet. On the pipe line at a point a few feet west of the mail box is an outlet valve or gate and through this valve or gate gas from the pipe line was released immediately before the plaintiff was injured. The road is level and practically straight with an unobstructed view for a distance of eleven hundred and forty feet west, and for a distance of four hundred and sixty feet east, of the mail box.

During the forenoon of October 17, 1950, employees of the State Road Commission in doing road work accidentally punctured the four inch pipe line of the defendant at a point approximately a mile and a half west of Buckhannon, which caused gas to escape or leak from the line and air, water and dirt to enter it. The general field foreman of the defendant, a man named Bailey, having learned of the break, sent a crew of several men to repair it. In making the repairs it was necessary to

shut off the supply of gas to the pipe line at a gate in the line about a half mile west of the break and to discontinue the supply of gas from three wells owned by Hanley and Bird, for whom the plaintiff was at the time employed as field foreman, which entered the pipe line of the defendant at a meter house apparently located between the gate and the break and about seven tenths of a mile west of the place where the plaintiff was injured. The general field foreman of the defendant cut off the supply of gas from the Hanley and Bird wells at the meter house and notified the plaintiff, by a telephone call to his wife at their residence in Weston, to shut off the supply of gas at the wells to protect the lines from the wells to the meter house and to prevent the pressure from the wells in the lines from injuring or breaking them. The plaintiff, who had been employed for about five years by Hanley and Bird to look after their gas wells in West Virginia and who was an experienced gas field worker, received the message from his wife while he was engaged in his work at the village of Peel Tree several miles distant from Buckhannon and, in response to the telephone call, came in a truck, which he used in his work, from Peel Tree through Buckhannon to the wells under his charge. He shut off the supply of gas from these wells and then went to the scene of the break in the defendant's pipe line while the repairs were being made. After spending some time there he went back to Buckhannon, telephoned his wife that he would be late in returning home, and then came to the place near the mail box where, after the break in the line had been repaired, the general field foreman of the defendant had decided to purge the line of the foreign substances which had entered it at the break. This was necessary before again turning the gas into the pipe line which supplied the residents of Buckhannon where, because of the break and the suspension of the flow of gas during the time required to repair it, there was a temporary shortage of gas.

In order to turn the gas from the wells of his employ-

ers, Hanley and Bird, into the pipe line of the defendant as soon as it was repaired and purged of the foreign substances it was necessary for the plaintiff to keep himself informed of the progress of the repairs and the work of purging the line, and he went to the scene of the repairs and to the scene of the purging of the line for the purpose of learning when to return the supply of gas from the three wells of his employers to the pipe line of the defendant. He was present for that purpose when the work of purging the line was in progress and when he received the injuries for which he seeks a recovery in this litigation.

After the repairs to the line were completed during the afternoon of October 17, 1950, and between four and five o'clock, the exact time being variously fixed by different witnesses, the general field foreman and his crew of several experienced gas field employees went to the valve or the gate on the pipe line near the mail box and began the work of purging the line. In doing that work, which was observed by the plaintiff from a location as to which the evidence is conflicting, the five members of the crew who participated, under the direction of the general field foreman, made an extended outlet which consisted of a line two inches in diameter in which a rubber hose fifty feet in length and two sections of metal pipe each twenty one feet in length were used and connected together. After uncovering the valve on the four inch pipe line by digging a hole in the ground for that purpose, the members of the crew placed the outlet line at approximately right angles to the pipe line and extended it through the open space between the Haskins residence and the Peterson residence with the open end of the outlet line approximately one hundred and five feet from the northern edge of the concrete pavement of the highway. The end of the hose near the road was connected to metal appliances attached to the pipe line at approximately the ground level and the opposite end of the hose was joined by a "brass connection" to the first of the two twenty one foot connected sections of

two inch metal pipe. The approximate length of this extended outlet, consisting of the hose and the two sections of metal pipe, was ninety two feet and its open end was placed through an opening in a woven wire fence at an elevation of two or three feet above the surface of the land in the space between the residences of Haskins and Peterson.

When the rubber hose and the metal sections of the outlet line had been joined together and the line placed, as indicated, the general field foreman caused one member of the crew to notify the occupants of the Haskins and Peterson residences to extinguish any fires in either of those houses to prevent the ignition of the gas to be expelled from the open end of the outlet and then sent another member of the crew to the gate located about a half mile west of the place where the break in the pipe line had occurred for the purpose of turning on the gas and permitting it to flow through the line to the valve at the point where the outlet had been connected to the four inch pipe line.

Shortly before the gate to the west of the break was opened to permit the flow of the gas through the four inch pipe line from that point, one of the crew was stationed near the hole where the hose was connected to the valve in the four inch pipe line for the purpose of opening the valve with a wrench to permit the gas from the four inch pipe line to pass through the outlet line and remove the air, water and dirt from the pipe line. At that time, according to the testimony of the general field foreman of the defendant, three members of the crew, and an employee of the defendant who testified as a witness in behalf of the plaintiff, the plaintiff, who had observed the work of connecting and placing the outlet line, was standing near and to the right of the hole and north of the berm and, in that position he was north of the ditch and between it and the four inch pipe line and also between the general field foreman, who was standing nearer the hole and to the left of the plaintiff,

and the witness for the plaintiff, who was standing to the right of the plaintiff. According to the testimony of the plaintiff, however, he was not where these witnesses said he was but was standing "back at the road" on the berm and south of the ditch though he stated that the general field foreman and the witness who testified in his behalf were present and nearby.

When the plaintiff came back from Buckhannon to the place where the crew was preparing to purge the pipe line he drove his truck about forty feet west of that point, parked his truck there, and came back to the place "where the men were working". Though he observed their work in placing the outlet line and was present for about twenty minutes while that work was in progress, he had nothing to do with and did not participate in the operation. He was present merely for the purpose of ascertaining when to turn the supply of gas from the wells of his employers into the four inch pipe line of the defendant at the meter house after the purging operation was completed. While present, however, as an experienced gas field worker, he made some statements about the manner in which the outlet line was placed and constructed and would be used. As to those matters he gave this testimony: "Q. And did you have any conversation with the men when you walked back there? A. Well, when they were bringing the hose to connect it up, I asked if they were going to use that to blow the line out. Q. Do you recall if you asked any particular one? A. The men were working, and I don't know which one I asked, probably all in the company. Q. How many men of the C. & A. Gas Company were working there at that time? A. Four or five. Q. Was Mr. Bailey there? A. Yes, sir, he was standing there. Q. What did you ask them? A. If they were going to use the hose to blow out the line and they said they were. Q. Just go ahead and tell the conversation. A. I said 'The hose if put under pressure it will cause it to whirl', and one man spoke up and said 'we are going to weight it down,' and I said 'what with?' and they said 'Two joints of two inch

pipe or tubing'—practically the same—and I said 'If you do it will whirl up,' and they said that they would anchor it and get on it, and I said, 'Well, that looks like that would take care of it.' Q. They said they intended to anchor it and get on it? A. Yes, sir. Q. And you thought that would be sufficient? A. Yes, sir. Q. Did you rely upon what they said they were going to do? A. Yes, I did. Q. Did you have anything to do with the installation of the hose or pipe or fastening? A. No, sir. Q. Were you near when they were fastening the tubing on to the hose? A. No, sir, I was back at the road."

The plaintiff also testified that when the general field foreman, Bailey, sent one of the crew to the gate west of the place of the break to turn on the gas, the plaintiff asked Bailey "Are you going to stop the traffic?" on the road and that Bailey replied "Yes." Bailey testified that he did not remember having any such conversation with the plaintiff and the employee who was sent to turn on the gas and three other members of the crew testified that they did not hear any such conversation between Bailey and the plaintiff. The plaintiff also testified that during the purging operation and when the hose became disconnected from the metal pipe four men were standing on the pipe and that none of the men was standing on the hose. This testimony is denied by each of the four members of the crew who were present at the time and by the general field foreman all of whom testified that three of the men were standing on the hose and that no one was standing on the metal pipe.

After the gas was turned into the pipe line the workman at the valve near the mail box gradually released the gas into the outlet line. As the gas entered and passed through that line it made a "singing" noise, which some of the witnesses testified was loud and sounded like steam, and the hose twisted or whirled as predicted by the plaintiff. At that time, according to several witnesses for the defendant, there were three men standing on the hose. One of them, the man farthest from the valve,

was about eight feet from the end of the hose which was connected with the metal pipe. The other two men were between him and the valve and the three men were from ten to twenty feet from each other. When the gas had been flowing through the outlet line for about one minute the man near the far end of the hose discovered a leak at the connection between the hose and the metal pipe and almost immediately after he discovered the leak the connection broke. The metal piece attached to the pipe and which extended into the end of the hose came out of the hose and the connection suddenly parted. He called to the man at the valve to shut off the flow of the gas which he did within a few seconds. When the connection broke the end of the hose rose in the air to a height from four to eight feet, according to the testimony of some of the members of the crew, from eight to ten feet according to an employee of the defendant who testified as a witness for the plaintiff, and about fifteen feet, according to the testimony of the plaintiff. The men on the hose continued to hold it until the gas was turned off when it ceased to move or whirl and it dropped or fell to the ground. At no time did the hose escape from the men who were holding it and only the eight feet at the end which had been connected to the metal pipe rose to any noticeable height above the ground.

The men engaged in the operation testified that they were not frightened and that they did not see any one run. A witness for the plaintiff who was standing near him at the time testified that he "moved rapidly" along the highway from the original position in which he was standing. The plaintiff testified that when he saw the end of the hose rise about fifteen feet in the air it came toward him, that he was frightened, that others present "scattered", that he jumped to avoid being struck by it, and that after he jumped he did not remember anything until he regained consciousness after he was struck by an automobile. The hose did not strike the plaintiff or any other person who was present at the time. Though no one saw the plaintiff run, it is evident that he ran or

moved rapidly from the position in which he was standing when the connection broke and went south of the center of the pavement of the road opposite the mail box where he ran into or was struck by an automobile which was traveling east on that side of the road in the direction of Buckhannon. The testimony of the two men in the automobile was that it was traveling about twenty five or thirty miles per hour, and that they did not see the plaintiff until the left side or front end of the automobile struck him. The plaintiff was carried or knocked by the automobile a distance of about thirty five feet east of the point at which it struck him and he fell and lay at or near the left or northern edge of the concrete pavement of the road a few feet from a driveway which extended from that side of the road to the Peterson residence.

Immediately following his injury the plaintiff, who was bleeding, unconscious and in a state of shock, was given first aid treatment by the driver of the automobile and, after the arrival of a doctor who was called, he was taken to a hospital in Buckhannon and later removed to a hospital in Clarksburg. His injuries consisted of a wound above his left eye, a fracture of his pelvis, a compound fracture of his right leg and multiple contusions on different parts of his body. In the treatment of his injuries he has been required to submit to several surgical operations and the fracture of the bones of his right leg had not united at the time of the trial. At that time he walked with difficulty and he was required to wear a brace on his right leg. He still experiences pain and since his injury he has not been able to engage in any work. The expenses incurred by him for the treatment of his injuries, including hospital charges and medical fees, amount to $611.18. Other similar expenses and charges, the amount of which is not disclosed by the evidence, have been paid from the Workmen's Compensation Fund of this State of which the plaintiff, as an employee, is a beneficiary.

By its assignments of error the defendant seeks re-

versal of the judgment on substantially these grounds: (1) The evidence does not show that the defendant was guilty of actionable negligence because (a) the defendant did not violate any duty owed by it to the plaintiff and (b) the acts and the omissions of the defendant were not the proximate cause of the injuries sustained by the plaintiff; (2) the plaintiff voluntarily exposed himself to and assumed the risks involved; (3) Instruction No. 1 offered by the plaintiff and given by the trial court was erroneous and should have been refused; and (4) the verdict is excessive.

At the time of his injury the plaintiff had a right to be present at the scene of the operation conducted by the defendant in purging its pipe line. Though it was not necessary that he should be near the valve, where some of the witnesses said he was, or "back at the road" and on the berm where he said he was, when the connection suddenly parted, to ascertain when to turn the gas from the wells of his employers into the pipe line of the defendant, as he was required to do by his employers, his continued presence at the scene until he was injured was neither improper nor forbidden by the defendant. By promptly turning on the gas from the wells of his employers as soon as the pipe line of the defendant was ready to receive it, the plaintiff would have aided the defendant in relieving as quickly as possible the existing temporary shortage of gas which affected its consumers in Buckhannon. By permitting him to remain, without objection and with knowledge of his presence, at the scene and on premises under the control of the defendant, where the plaintiff was when the connection parted, according to witnesses in behalf of the defendant and a witness in behalf of the plaintiff, the agent of the defendant, in charge of the operation, impliedly invited the presence of the plaintiff, and his status was that of an invitee of the defendant. While the plaintiff as such invitee was on premises under its control, the defendant owed him the duty of exercising ordinary care to keep and maintain such premises in a reasonably safe con-

dition. See *Koehler* v. *Ohio Valley General Hospital Association,* 137 W. Va. 764, 73 S. E. 2d 673; *Cooper* v. *Pritchard Motor Company,* 128 W. Va. 312, 36 S. E. 2d 405; *Early* v. *Lowe,* 119 W. Va. 690, 195 S. E. 852; *Starcher* v. *South Penn Oil Company,* 81 W. Va. 587, 95 S. E. 28; *Smith* v. *Sunday Creek Company,* 74 W. Va. 606, 82 S. E. 608; *Smith* v. *Parkersburg Co-Operative Association,* 48 W. Va. 232, 37 S. E. 645; *Walker* v. *Memorial Hospital,* 187 Va. 5, 45 S. E. 2d 898; *Hospital of Saint Vincent of Paul* v. *Thompson,* 116 Va. 101, 81 S. E. 13, 51 L. R. A., N. S., 1025. If, in the existing situation, however, the plaintiff was not on premises under the control of the defendant at the time the connection parted but was, as he testified, "back at the road", he was rightfully there present as a bystander on or a person using a public highway, and as such, the defendant likewise owed him the duty to exercise ordinary care not to injure him.

Notwithstanding the duty of the defendant to exercise ordinary care not to injure the plaintiff, the evidence does not show that the defendant was guilty of any negligent act or omission which was the proximate cause of the injury of which the plaintiff complains. The operation of purging the pipe line of the defendant was engaged in and conducted by competent employees who were skilled and experienced in that type of activity. The equipment used was in good condition and free from any known defects. Though neither the workmen nor the general field foreman had, on any previous occasion, used a rubber hose in purging a gas transmission pipe line, the use of such hose for that purpose was not regarded by any of them as dangerous or likely to cause an injury. Neither the act of the defendant in causing gas to flow through and escape from the outlet line, nor its omission in failing to prevent the break in the connection between the hose and the metal pipe, directly resulted in any injury to the plaintiff. The escaping gas did not injure him and the moving hose did not touch or strike or even come dangerously near him. If the loose end of the hose rose to a

height of fifteen feet in the air, as testified to by the plaintiff, and if that much of the hose went directly toward the road before the flow of the gas was stopped, the distance between that end of the hose and the plaintiff, if he was standing near the valve, was at least twenty feet, and if he was standing on the berm of the road, the distance between that end of the hose and the plaintiff was at least twenty seven and one half feet, before he started to cross the paved portion of the road and continued on that course until he went against or in front of the automobile on the south side of that part of the road. In causing the gas to flow through and escape from the outlet line and in failing to prevent the break in the connection the defendant could not reasonably anticipate or foresee that either act or omission of its employees would cause the plaintiff, who was acquainted with and experienced in the operation of purging a gas transmission pipe line, to run or flee, as he undoubtedly did, from the hose, to come in contact with a passing automobile on the opposite side of the road and, in so acting, to receive an injury. If the plaintiff had acted as the other uninjured persons near him acted, and had remained where he was, or had moved laterally along the berm of the road, or had gone in any direction other than toward the hose or toward the automobile, he would not have been injured.

In order to recover in an action based on negligence the plaintiff must prove that the defendant was guilty of primary negligence and that such negligence was the proximate cause of the injury of which the plaintiff complains. *McKinney* v. *Miller,* 138 W. Va. 324, 75 S. E. 2d 854; *Holiman* v. *Baltimore and Ohio Railroad Company,* 137 W. Va. 874, 74 S. E. 2d 767; *Webb* v. *Sessler,* 135 W. Va. 341, 63 S. E. 2d 65; *Divita* v. *Atlantic Trucking Company,* 129 W. Va. 267, 40 S. E. 2d 324; *Fleming* v. *McMillan,* 125 W. Va. 356, 26 S. E. 2d 8; *Jones* v. *Virginian Railway Company,* 115 W. Va. 665, 177 S. E. 621; *Fleming* v. *Hartrick,* 100 W. Va. 714, 131 S. E. 558; *Donald* v. *Long Branch Coal Company,* 86 W.

Va. 249, 103 S. E. 55; *Massie* v. *Peel Splint Coal Company*, 41 W. Va., 620, 24 S. E. 644. Negligence to be actionable must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury. *State ex rel. Cox* v. *Sims*, 138 W. Va. 482, 77 S. E. 2d 151; *Donald* v. *Long Branch Coal Company*, 86 W. Va. 249, 103 S. E. 55; *Anderson* v. *Baltimore and Ohio Railroad Company*, 74 W. Va. 17, 81 S. E. 579, 51 L. R. A., N. S., 888. Actionable negligence necessarily includes the element of reasonable anticipation that some injury might result from the act of which complaint is made. *Koehler, Admr.* v. *Waukesha Milk Company*, 190 Wis. 52, 208 N. W. 901. Failure to take precautionary measures to prevent an injury which if taken would have prevented the injury is not negligence if the injury could not reasonably have been anticipated and would not have happened if unusual circumstances had not occurred. *State ex rel. Cox* v. *Sims*, 138 W. Va. 482, 77 S. E. 2d 151; *Dennis* v. *Odend'Hal-Monks Corporation*, 182 Va. 77, 28 S. E. 2d 4; *Virginia Iron, Coal and Coke Company* v. *Hughes, Adm'r.*, 118 Va. 731; 88 S. E. 88. "Where a course of conduct is not prescribed by mandate of law, foreseeability of injury to one to whom duty is owed is of the very essence of negligence." 13 M. J., Negligence, Section 22. *Cleveland* v. *Danville Traction and Power Company*, 179 Va. 256, 18 S. E. 2d 913. A person is not liable for damages which result from an event which was not expected and could not have been anticipated by an ordinary prudent person. *Barbee* v. *Amory*, 106 W. Va. 507, 146 S. E. 59; *Consumers' Brewing Company* v. *Doyle's Admx.*, 102 Va. 399, 46 S. E. 390; *Fowlks* v. *Southern Railway Company*, 96 Va. 742, 32 S. E. 464; *Southern Railway Company* v. *Bell*, 4th. Cir., 114 F. 2d 341. "If an occurrence is one that could not reasonably have been expected the defendant is not liable. Foreseeableness or reasonable anticipation of the consequences of an act is determinative of defendant's negligence." *Dennis* v. *Odend'Hal-Monks Corporation*, 182 Va. 77, 28 S. E. 2d 4. In the recent case

of *Wilson* v. *Edwards,* 138 W. Va. 613, 77 S. E. 2d 164, this Court used this quotation from the case of *Osborne* v. *Atlantic Ice and Coal Company,* 207 N. C. 545, 177 S. E. 796: "The law only requires reasonable foresight, and when the injury complained of is not reasonably foreseeable, in the exercise of due care, the party whose conduct is under investigation is not answerable therefor. Foreseeable injury is a requisite of proximate cause, and proximate cause is a requisite for actionable negligence, and actionable negligence is a requisite for recovery in an action for personal injury negligently inflicted."

In *State ex rel. Cox* v. *Sims,* 138 W. Va. 482, 77 S. E. 2d 151, this Court said: "To warrant a finding that negligence is the proximate cause of an injury it must appear that the injury was the natural and probable consequence of the negligent act and that it ought to have been foreseen in the light of the attending circumstances. *Scheffer* v. *Washington City, Virginia Midland and Great Southern Railroad Company,* 105 U. S. 249, 26 L. Ed. 1070; *Milwaukee and St. Paul Railway Company* v. *Kellogg,* 94 U. S. 469, 24 L. Ed. 256; *Spence* v. *American Oil Company,* 171 Va. 62, 197 S. E. 468, 118 A. L. R. 1120; *Fowlks* v. *Southern Railway Company,* 96 Va. 742, 32 S. E. 464; *Connell's Ex'rs.* v. *Chesapeake and Ohio Railway Company,* 93 Va. 44, 24 S. E. 467. One requisite of proximate cause is the doing or the failure to do an act which a person of ordinary prudence could foresee might naturally or probably produce an injury, and the other requisite is that such act or omission did produce the injury. *Washington and Old Dominion Railway* v. *Weakley,* 140 Va. 796, 125 S. E. 672; *Virginia Iron, Coal and Coke Company* v. *Hughes' Adm'r.,* 118 Va. 731, 88 S. E. 88."

The proximate cause of an injury is the last negligent act contributing to the injury and without which the injury would not have resulted. *Webb* v. *Sessler,* 135 W. Va. 341, 63 S. E. 2d 65; *Estep* v. *Price,* 93 W. Va. 81, 115 S. E. 861; *Schwartz* v. *Shull,* 45 W. Va. 405, 31 S. E. 914. The proximate cause of an event is that cause which

in actual sequence, unbroken by any independent cause, produces the event and without which the event would not have occurred. *Webb* v. *Sessler,* 135 W. Va. 341, 63 S. E. 2d 65; *Anderson* v. *Baltimore and Ohio Railway Company,* 74 W. Va. 17, 81 S. E. 579, 51 L. R. A., N. S., 888. The act of the plaintiff in leaving the position in which he was standing when the far end of the hose rose in the air, in attempting to cross the highway, and in coming in contact with the moving automobile, as he undoubtedly did without looking or exercising due care to discover the presence of the automobile, was the last act which caused or contributed to his injury and broke any casual connection between the acts and the omissions of the defendant and the injury sustained by the plaintiff. In so acting the plaintiff was guilty of negligence which proximately caused his injury.

Though there are some discrepancies in the testimony of the various witnesses concerning the location at which the plaintiff was standing, the height to which the hose rose in the air, and the position of the men on the outlet line, which are not of controlling or material importance, the evidence of the acts and the omissions of the defendant in conducting its operation to purge its pipe line and the act of the plaintiff in coming in contact with the automobile is without substantial conflict. When the material facts are undisputed and reasonable men can draw only one conclusion from them, the question of negligence is a question of law for the court. *Holiman* v. *Baltimore and Ohio Railway Company,* 137 W. Va. 874, 74 S. E. 2d 767; *Daugherty* v. *Baltimore and Ohio Railway Company,* 135 W. Va. 688, 64 S. E. 2d 231; *Cooper* v. *Pritchard Motor Company,* 128 W. Va. 312, 36 S. E. 2d 405; *Wood* v. *Shrewsbury,* 117 W. Va. 569, 186 S. E. 294; *Barron* v. *Baltimore and Ohio Railroad Company,* 116 W. Va. 21, 176 S. E. 277; *Linville* v. *Chesapeake and Ohio Railway Company,* 115 W. Va. 610, 177 S. E. 538; *Craft* v. *Fordson Coal Company,* 114 W. Va. 295, 171 S. E. 886; *Daniels* v. *Chesapeake and Ohio Railway Company,* 94 W. Va. 56, 117 S. E. 695; *Donald* v. *Long Branch*

*Coal Company,* 86 W. Va. 249, 103 S. E. 55; *Reilly* v. *Nicoll,* 72 W. Va. 189, 77 S. E. 897, 47 L. R. A., N. S., 1199; *Ketterman* v. *Dry Fork Railroad Company,* 48 W. Va. 606, 37 S. E. 683; *Klinker* v. *Wheeling Steel and Iron Company,* 43 W. Va. 219, 27 S. E. 237; *Raines* v. *Chesapeake and Ohio Railway Company,* 39 W. Va. 50, 19 S. E. 565. As the evidence fails to show that the defendant was guilty of any act or omission which was the proximate cause of the injury to the plaintiff the respective motions of the defendant to direct a verdict in its favor should have been sustained; and the action of the circuit court in refusing to sustain the motion of the defendant for a directed verdict at the conclusion of the evidence constituted reversible error.

The defendant contends that the plaintiff, by remaining at the scene of the operation of the defendant in purging its pipe line, with full knowledge and appreciation of the movement of the hose before and when the connection in the outlet line broke, assumed the risk of any injury which might reasonably be expected to result, and that the doctrine of assumption of risk applies as a defense in this case. This contention is not well founded.

Contributory negligence and assumption of risk are not identical. "The essence of contributory negligence is carelessness; of assumption of risk, venturousness." *Wright* v. *Valan,* 130 W. Va. 466, 43 S. E. 2d 364; *Hunn* v. *Windsor Hotel Company,* 119 W. Va. 215, 193 S. E. 57. Contributory negligence rests in tort; assumption of risk rests in contract or in the principle expressed by the maxim "volenti non fit injuria" which translated is that "he who consents can not receive an injury." *Wright* v. *Valan,* 130 W. Va. 466, 43 S. E. 2d 364; 38 Am. Jur., Negligence, Sections 171, 172; 65 C. J. S., Negligence, Section 174; Black's Law Dictionary, 4th Edition, page 1746. Contributory negligence implies the failure to exercise due care; assumption of risk involves a choice made more or less deliberately and negatives liability

even though the plaintiff may have acted with due care. The doctrine of assumption of risk is not limited to the relation of master and servant or to other contractual relations with respect to situations in which a person voluntarily assumes what is sometimes characterized as an incurred risk incident to a known and appreciated danger. *Wright* v. *Valan,* 130 W. Va. 466, 43 S. E. 2d 364; 38 Am. Jur., Negligence, Section 172.

The doctrine of assumed or incurred risk is based upon the existence of a factual situation in which the act of the defendant alone creates the danger and causes the injury, and the plaintiff voluntarily exposes himself to the danger with full knowledge and appreciation of its existence. 65 C. J. S., Negligence, Section 174; 62 C. J. 1102; *Gill* v. *Arthur,* 69 Ohio App. 386, 43 N. E. 2d 894; *Masters* v. *New York Central Railroad Company,* 147 Ohio St. 293, 70 N. E. 2d 898, certiorari denied 331 U. S. 836, 67 S. Ct. 1519, 91 L. Ed. 1848, rehearsing denied 332 U. S. 786, 68 S. Ct. 33, 92 L. Ed. 369; *Ringling Bros.- Barnum & Bailey Combined Shows, Inc.* v. *Olvera,* 9th Cir., 119 F. 2d 584; *Standard Oil Company* v. *Titus,* 187 Ky. 560, 219 S. W. 1077; *Cincinnati, New Orleans and Texas Pacific Railway Company* v. *Goldston,* 156 Ky. 410, 161 S. W. 246; *Fitzgerald* v. *Connecticut River Paper Company,* 155 Mass. 155, 29 N. E. 464, 31 Am. St. Rep. 537. The doctrine has been stated in these words: "A person, who brings about a condition or situation obviously dangerous to himself by voluntarily exposing himself to a hazard created by another, assumes the risk of injury so created and thereby relieves such other of legal responsibility for an injury resulting from such exposures." Point 4, syllabus, *Masters* v. *New York Central Railroad Company,* 147 Ohio St. 293, 70 N. E. 2d 898, certiorari denied 331 U. S. 836, 67 S. Ct. 1519, 91 L. Ed. 1848, rehearing denied 332 U. S. 786, 68 S. Ct. 33, 92 L. Ed. 369. As the risk of danger which resulted from the acts and the omissions of the defendant, voluntarily assumed by the plaintiff by remaining at the scene of the operation conducted by the defendant, did

not cause injury to the plaintiff, and as the act of the plaintiff in leaving the scene and in coming in contact with the moving automobile effectively caused or contributed to his injury, the doctrine has no present application. It does not apply to a situation in which one person creates a danger and another person, with knowledge and appreciation of its existence, voluntarily assumes the risk of such danger but is not injured by it.

The defendant also complains of the action of the circuit court in giving over its objection Instruction No. 1 offered by the plaintiff. The instruction is expressed in this language: "The Court instructs the jury that a person who is required to act in a sudden emergency, even if he acts unwisely, is not guilty of negligence in law, since the case of sudden and unexpected danger, necessitating an immediate decision as to which of two or more ways of escape will be resorted to, the law makes allowance for error of judgment, even though it appears that the resulting injury could have been avoided if the party so placed in peril had pursued a different course. But this rule has no application except in cases where the plaintiff had been placed in the situation of danger by the negligence of the defendant, not united with his own negligence." The instruction assumed the existence of a sudden emergency and withdrew from the jury the questions whether a sudden emergency in fact existed, whether the emergency, if such existed, was created by the defendant, and whether plaintiff, in acting as he did, exercised the care of a reasonably prudent person in like circumstances.

In support of the instruction the plaintiff cites and relies upon the Virginia case of *Chesapeake and Ohio Railway Company* v. *Crum*, 140 Va. 333, 125 S. E. 301, a railroad crossing case, in which an instruction in identical language was approved. The principal challenge to the instruction was that it was a mere abstract statement of law and was without evidence to support it. The court found that there was sufficient evidence on which to base

the instruction and, by approving it, held that it correctly propounded the law. On that point the holding in that case is not in accord with a number of decisions of this Court hereafter cited and this Court adheres to the rule enunciated in those decisions.

The instruction is erroneous and should not have been given. It assumed as a matter of law the existence of a sudden emergency, *Somerville* v. *Dellosa,* 133 W. Va. 435, 56 S. E. 2d 756, which ordinarily is a question of fact for jury determination, and it misstated the law applicable to the conduct of a person confronted with a sudden emergency created by another person. The rule of law which applies to the conduct of a person in a sudden emergency created by another person is that if the person so confronted acts according to his best judgment or, because of insufficient time in which to form a judgment, fails to act in the most judicious manner, he is not guilty of negligence if he exercises the care of a reasonably prudent person in like circumstances. *Laphew* v. *Consolidated Bus Lines,* 133 W. Va. 291, 55 S. E. 2d 881; *O'Dell* v. *Universal Credit Company,* 118 W. Va. 678, 191 S. E. 568; *Robertson* v. *Hobson,* 114 W. Va. 236, 171 S. E. 745; *Warth* v. *County Court of Jackson County,* 71 W. Va. 184, 76 S. E. 420; *Dimmey* v. *Wheeling and Elm Grove Railroad Company,* 27 W. Va. 32; *Jones* v. *Hanbury,* 158 Va. 842, 164 S. E. 545; 38 Am. Jur., Negligence, Section 41. An instruction which does not correctly state the law is erroneous. *Wilson* v. *Edwards,* 138 W. Va. 613, 77 S. E. 2d 164; *Moore* v. *Turner,* 137 W. Va. 299, 71 S. E. 2d 342; *Thomason* v. *Mosrie,* 134 W. Va. 634, 60 S. E. 2d 699; *Gilkerson* v. *Baltimore and Ohio Railroad Company,* 129 W.Va. 649, 41 S. E. 2d 188; *Parrish* v. *City of Huntington,* 57 W. Va. 286, 50 S. E. 416. The instruction is abstract in form and, in not correctly propounding the law, is also misleading. It is reversible error to give an abstract instruction which tends to mislead or confuse the jury. *Chaney* v. *Moore,* 101 W. Va. 621, 134 S. E. 204; *Frank* v. *Monongahela Valley Traction Company,* 75 W. Va. 364, 83 S. E. 1009. As previously indicated,

under the evidence disclosed by the record, the question whether the defendant was guilty of actionable negligence was a question of law for the court and should not have been submitted to the jury. But even if the evidence had been sufficient to submit that issue to the jury, Instruction No. 1, offered by the plaintiff, being erroneous for the reasons indicated, should have been refused, and the action of the circuit court in giving it constituted reversible error.

As the plaintiff, under the evidence, was not entitled to a recovery, it is unnecessary to consider or decide whether the amount of the verdict was excessive.

For the reasons stated the judgment of the Circuit Court of Randolph County is reversed, the verdict is set aside, and a new trial is awarded the defendant.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*