WEBB, JUDGE:
Claimant Anna Springer brought this action for the wrongful death of her husband, James B. Springer, after the vehicle he was driving slid off a bridge when he was traveling westbound on County Route 1/1, locally known as the Cleveland Wildcat Road in the Hacker Valley region of Webster County. County Route 1/1, at this location, is maintained by respondent in Webster County. This claim was bifurcated by Order and the initial hearing was limited to the issue of liability. The Court is of the opinion to deny this claim for the reasons more fully set forth below.
The incident giving rise to this claim occurred on January 13, 1997, at approximately 9:30 a.m. On the cold and snowy morning in question, the deceased, James B. Springer, and his brother Timothy Springer were traveling westbound on County Route 1/1 in a 1994 Ford F-150 XLT truck owned by the family business. On the morning in question, James B. Springer and Timothy Springer decided to go to a job site near Jumbo, Webster County. The James B. Springer residence is approximately one and three-quarter miles from the bridge in question. According to Timothy Springer, this was the shortest and safest route. Timothy Springer further testified that James B. Springer was an experienced driver; that he was very familiar with the road in question; that he was driving carefully at a speed of about five miles per hour down the snow covered hill; that while the road was snow covered, it was not icy; that as the truck approached the bridge, it suddenly began sliding; that the decedent and Timothy Springer both felt the movement of the truck as it began sliding; and that the decedent made a comment about the fact that they were sliding. The truck proceeded onto the bridge structure, turned sideways, hesitated at the edge of the bridge, and then rocked over the edge of the bridge. It fell approximately ten feet and landed in the creek known as the Williams Camp Run. The truck fell on its top when it landed in the upstream side of the creek. Timothy Springer testified that he believed that the truck got caught on a wheel curb that had been bent over the side of the bridge. Nearby individuals arrived at the scene to render assistance, including the Springers’ other brother, David Springer. Timothy Springer escaped the truck with only minor injuries. Tragically, James B. Springer was trapped inside the vehicle. When James B. Springer was finally removed from the vehicle, attempts to revive him failed and he subsequently died.
Claimant’s position in this claim is two-fold. Claimant alleges that respondent was negligent in its maintenance of the bridge and that it failed to provide guardrails on the bridge which would have prevented claimant’s decedent from sliding in his truck off the side of the bridge. Secondly, claimant alleges that the design of the bridge was faulty in that it came at the bottom of a steep hill with an approach in a sharp curve on the easterly side and a fork with two sharp curves on the westerly side of the bridge.
Respondent contends that the driver error on the part of the decedent was the cause of the incident in which he died. Respondent also contends that this particular bridge is a typical bridge for a third priority road such as County Route 1 /I in Webster County and that it was maintained in the same manner as the other bridges twenty feet or less in length. Further, respondent raised the issue that the decedent and his brother chose to drive west rather than east on the Cleveland Wildcat Road and that the better *44 choice of route to exit this road was to go east from their homes rather than west toward the bridge over W illiams Camp Run.[1] Respondent contends that the placement of guard rail on the bridges and highways throughout our State is discretionary with the Commissioner of the Division of Highways; therefore, a claim based upon the lack of guard rail is not a viable claim before this Court.
At this location, County Route 1/1 is a third priority dirt and gravel road with an average daily travel of approximately twenty vehicles per day. The road is narrow and basically is a one-lane road although there may be areas where two vehicles are able to pass. It has an average width of about twelve feet. As County Route 1/1 proceeds in a westerly direction toward a bridge referred to as the Williams Camp Run in the Boggs Mill area, the road has a steep slope approximately six-hundred-thirty-one feet in length. At the top of the slope, the slope is eight percent for one-hundred-thirty-five feet, which then increases to seventeen and one-half percent for approximately two hundred feet and finally decreases to thirteen percent for approximately one hundred feet, at the bottom of the slope. At the bottom of the slope to the southwest side of the road, there is a sharp right turn onto a one-lane wooden bridge over Williams Camp Run and sharp right or left turns (a fork area) after leaving the wooden bridge. Glen Edward F isher, an Operator III for respondent, testified that because of the shade of the hill, the curve where the incident occurred tends to remain slicker than other parts of the road. David Springer, one of the decedent’s brothers, also testified that this particular curve in the road is well shaded, and very seldom sees sunlight. Therefore, it was undisputed that this portion of the road tends to be slicker than other areas.
The bridge in question was built in 1963 across Williams Camp Run, a small stream. It is situated approximately ten feet above Williams Camp Run which normally has a depth of approximately three inches. The bridge was twenty feet seven inches in length consisting of two seventeen foot concrete abutments which were connected by five steel beams. The overlay of the bridge is wooden. The width of the bridge’s deck was fifteen feet and the roadway width was fourteen feet. On each side of the bridge, two six inch by six inch wooden (oak) boards, which run the length of the bridge, were mounted to the steel beams underneath of the bridge by angle iron fasteners. Testimony established that these boards, commonly referred to by the witnesses as “wheel curbs,” “rub rails,” or “hub rails” functioned to warn a driver of a vehicle of the edge of the bridge. Hub rails on bridges are not intended to hold a vehicle on the bridge or to act as a guard rail. Marvin Murphy, a civil engineer and the District Administrator for respondent over W ebster County at the time of this incident, explained that hub rails are designed to protect vehicles from going out on the edge of the bridge deck where it is weak. At one time, wooden hand rails were attached to the side of the bridge, but these *45 had been knocked down many years prior to the incident herein. No guardrails had ever been present on the bridge. Respondent’s District Seven Design Engineer, Thomas Freeman, testified that guardrails are not usually present on this type of road or bridge because of the low average daily travel. Furthermore, Mr. Freeman testified that this is a “third priority” route so designated for purposes of SRIC (snow removal and ice control), i.e., the routes designated as first priority are treated first, then the secondary roads, and the third priority roads are treated last. Third priority routes are those that are either stone based or dirt roads and in terms of treatment are generally cinder treated or plow only.
Respondent’s Bridge Evaluation Reports adduced at the hearing established that the condition of the bridge deteriorated from a “good” to “fair” condition in March of 1987, and to a “poor” condition in June 1994. The 1994 report indicated that the deck had broken boards covered with runners, the steel was rusty, the curbs as well as scuppers were damaged and there were no diaphragms. After the 1994 report, no remedial measures were taken to repair the bridge. However, Glen E. Fisher, an Operator Three for respondent, testified that over time some repairs to the bridge had been made. He testified that part of his crew and a mechanic from the Webster Springs Cherry Fall Headquarters did work on and replaced the “hub rails”on this bridge. This repair work, according to Mr. Fisher, was done approximately one to one and one-half years prior to this incident. Mr. Fisher also testified that he had received only verbal complaints about the road and bridge at issue. These complaints were generally requests for cinder treatment during the wintertime for slick roads. Mr. Fisher also recalled that approximately twenty years prior to this incident that there were also complaints that the handrail along the sides of the bridge had been torn off by large gas trucks crossing the bridge. Jimmy Collins, Highway Administrator for respondent in W ebster County, also testified that he had not received any written complaints regarding the bridge. Neither Mr. Fisher nor Jimmy Collins could testify whether or not the “hub rail”onthe upstream side of the bridge where the Springer truck went off the bridge was bent in this incident or prior thereto. However, David Springer testified that the wheel curbs or hub rails on both sides of the bridge had been down for several years.
On the weekend before the incident, respondent’s weather records for Webster Springs indicated that there was snow accumulation of 0.32 inches.[2] On the day of the incident, there was no precipitation recorded for the same area. However, Jimmy Collins testified that the measurements are taken farther south at Webster Springs and may not be representative as to the amount of snowfall as in the Hacker Valley area where the incident herein occurred. He also testified that although he did not recall any snowfall the night before, when he got to the scene there was quite a bit of snow. W ebster County Deputy Sheriff David Lee Morris, the investigating officer who arrived at the scene about an hour after the incident, testified that there was up to fourteen inches of snow on the road surface. Officer Morris further testified that the road was slick and snow covered as he arrived at the scene. He maneuvered his four-wheel drive vehicle into fresh snow on the side of the road for better traction on the road. Officer Morris also testified as to the condition of the Springer truck. He stated that the driver’s side portion of the cab was mashed in more than the passenger side and that the driver’s side was also completely submerged.
*46 At the close of claimant’s presentation of evidence at the hearing conducted on July 26 and 27, 2000, respondent made a Motion to Dismiss this claim contending that claimant failed to establish negligence on the part of the respondent as claimant based its claim upon the lack of guard rail on the bridge and the placement of guard rail is a discretionary act vested with the Commissioner. At this time the Court denies respondent’s Motion to Dismiss as there were other issues addressed during claimant’s presentation of evidence in its case in chief that the Court is required to consider after having heard the evidence put forth by respondent in its case in chief.
The well-established principle of law in West Virginia is that the State is neither an insurer nor a guarantor of the safety of travelers upon its roads. Adkins vs. Sims, 130 W.Va. 645; 46 S.E.2d 81 (1947). As the Adkins Court stated:
[w]e do not think the failure of the state road commissioner to provide guard rails . . . constitutes negligence of any character, and particularly no such negligence as would create a moral obligation on the part of the State to pay damages for injury . . . assumed to have occurred through such failure, and as the proximate cause thereof. The very nature of the obligation of the State, in respect to the construction and maintenance of its highways, precludes the idea that its failure to exercise discretion in favor of a particular location over another, on whether it should provide guard rails ... at that point, is an act of negligence. Certainly, it must be known, as a matter of common information, that places of danger on our highways exist at innumerable points, particularly on our secondary roads. . . . In the very nature of things, the road commissioner must be permitted a discretion as to where the public money, entrusted to him for road purposes, should bp expended, and at what points guard rails . . . should be provided, and the honest exercise of that discretion cannot be negligence. . . . Certainly, where the road commissioner is vested with discretion in matters of this character, it cannot be negligence that he selects for safety measures one point over another. . . . Id., 130 W.Va. at 660, 661; 46 S.E.2d at 88, 89.[3]
It is clear that Adkins v. Sims is controlling law in this case. There was no duty on the respondent’s part to place guardrails on this bridge. Furthermore, testimony established that this type of bridge and roadway rarely have guardrails due to the fact that this is a third priority road and there is very low average daily traffic. Approximately twenty .percent of bridges in District Seven are similar to the bridge in the instant claim and only a few of those have guardrails on them. There was undisputed testimony that this bridge had never had guardrails placed on it. It is the opinion of this Court that respondent was not under any legal duty to place guardrails *47 on this bridge.
The other basis for liability set forth by Ms. Springer in this claim is that the respondent was negligent in its maintenance of the road and bridge. Respondent may be held liable only for defective conditions on or near a highway caused by its negligence. State ex rel. v. Gainer, 151 W.Va. 1002; 158 S.E.2d 145 (1967). In order to hold respondent liable for defects of this type, claimant must prove that respondent had actual or constructive notice of the defect and a reasonable time to take corrective action. Chapman vs. Dept. of Highways, 16 Ct. Cl. 103 (1986). However, respondent is held liable only for those defective conditions that are the proximate cause of claimant’s injuries or death. Roush v. Johnson, 139 W. Va. 607; 80 S.E.2d 857 (1954). One requisite of proximate cause is the doing of an act or the failure to do an act that a person of ordinary prudence could foresee may naturally or probably produce injury to or the death of another. The second requisite of proximate causation is that such act or omission did in fact produce the injury or death. Matthews v. Cumberland & Allegheny Gas Co. 138 W.Va. 639; 77 S.E.2d 180.
In this claim, the claimant failed to establish that the respondent committed any act or omission in its maintenance of the road and bridge in question that was the proximate cause of Mr. Springer’s tragic death. Respondent did not commit any act or omission which did in fact cause Mr. Springer’s death. Although the evidence established that respondent had notice of the poor condition ofthe bridge on County Route 1/1 in Webster County, neither the condition of the road nor the bridge were the proximate cause of the Springer vehicle going over the side of the bridge. The testimony adduced at tire hearing established that regardless of whether or not the hub rail or wheel curb was properly installed at the time of this accident, these structures are not designed or intended to prevent vehicles from going over the side of a bridge. These hub rails are not expected to support a vehicle or to keep one from going over the side ofthe bridge. The purpose ofthe hub rails is to provide a warning to a driver when he or she is too close to the edge of the bridge. Based upon the evidence with regard to the hub rail on the side of the bridge where claimant’s decedent’s truck went off the bridge, the Court is of the opinion that claimant has not established that the alleged bridge or road conditions were the proximate cause of the vehicle leaving the bridge. This particular bridge in this claim is typical of maiiy bridges on third priority roads throughout Webster County and, in general, throughout West Virginia.
Although testimony was forthcoming at the hearing of this claim that this particular bridge was replaced by respondent some months after this tragic accident with a new structure that has guardrails and a redesigned approach and exit for the bridge, the Court recognizes that respondent has the discretionary duty to replace structures as it has the funds available. There are outside factors that may influence the replacement of structures in our State including public pressure and/ or political pressure. Evidence of subsequent remedial measures may be indicative of negligent maintenance in a small percent ofthe claims heard by this Court, but in this claim the Court has determined that negligent maintenance of the bridge was not the proximate cause of the accident which occurred herein resulting in the death of James B. Springer.
The Court is not unmindful of the tragedy that struck this family on the date of the incident herein. The Court is very sympathetic to the claimant and her daughter; however, the Court has no legal basis upon which to make an award in this claim.
In accordance with the findings of fact and conclusions of law stated herein above, the Court is of the opinion to and does deny this claim; therefore, a hearing on *48 the issue of damages will not be docketed.
Claim disallowed.
(The Honorable Judge Robert M. Steptoe took part in the hearing and the decision of this claim, but he did not take part in the approval of the written opinion. The Honorable Judge Franklin L. Gritt, having been appointed to the Court on July 1, 2001, did not take part in the decision of this claim.)

 The Court notes that respondent proposes this particular defense on occasion in claims. This Court is of the opinion that a traveler using the roads of this State may have many choices of routes and if respondent does not believe that a particular route is not the one that should be taken by travelers, then it has the responsibility to close the road or advise travelers to avoid the route with explicit, marked signage; otherwise, a traveler may choose his/her route with the knowledge that it is well maintained and usable. Claimant’s decedent herein had a choice of which way to travel from his home and he chose the route which provided the most direct route to his destination which the Court has determined is what any driver could have done under the same circumstances.

 The distance from Webster Springs to the area in question is about fifteen to twenty miles.

 The Division of Highways, formerly the office of State Road Commissioner, was transferred to, and administratively attached to, the Department of Transportation by the Executive Reorganization Act of 1989. See W.Va. Code §§ 17-2A-1 & 5F-2-1.