BAKER, JUDGE:
Claimant Brenda Murphy brought this action as Administratrix of the Estate of Scott Chariton, her son, who died in an incident that occurred when Scott Charlton was operating his motorcycle on U.S. Route 250, Wetzel County, and he allegedly encountered a bump on a bridge near Hundred, West Virginia, causing him to lose control of his motorcycle. U.S. Route 250 is a road maintained by respondent. The Court is of the opinion to deny the claim for the reasons more fully stated below.
The incident giving rise to this claim occurred on May 30, 1999, at approximately 4:00 p.m. Claimant’s son, Scott Charlton, was traveling northbound on U.S. Route 250 on his 1993 Suzuki GSR sport motorcycle. U.S. Route 250 is a two-lane, paved highway in the area of the incident involved. Mr. Charlton was riding his motorcycle and he was joined by his friend Mark Malkoff who was also riding a motorcycle. Mr. Malkoff testified that he and Mr. Charlton had decided to go for a long ride that day, looking over their motorcycles for any problems before they left. They traveled on W. Va. Route 7 and U.S. Route 250. Upon reaching Hundred in Wetzel County, they stopped to have soft-drinks. After a brief rest, they again drove onto U.S. Route 250, proceeding northbound. The posted speed limit for U.S. Route 250 at this location is fifty-five miles per hour. The two men came to a bridge, before which is a curve warning sign and speed reduction plate of thirty-five miles per hour. Both men had on two prior occasions driven across this bridge, but on both occasions they had been traveling in the opposite, southbound lane. Mr. Malkoff stated that he did not recall seeing the curve sign or the cautionary speed limit sign. Mr. Malkoff, who was riding about five motorcycle lengths in front of Mr. Charlton, testified that his speed was fifty-five miles per hour. Mr. Malkoff testified that when he drove onto a bridge over a creek which was opposite from the Hundred Lumber Company, he encountered a lateral crack in the roadway which made both wheels of his motorcycle jump off the ground for a split second. Mr. Malkoff testified that:
“I was basically right next to the double yellow line closest to the inside of the lane. I was actually taking the apex on the comer wrong and that basically saved my life. It made both my wheels front and back jump up off the ground for a split second. When I came back down, I found myself almost to the white line on the right-hand side of the road, pulled myself back over. When I pulled myself back over, I looked in my rearview and I watched Scott wreck his motorcycle.”
*212 He had been riding close to the center yellow lines when he suddenly found himself closer to the white lines on the right side of the northbound lane. He was able to control his bike and align himself closer to the center lines when he looked in his rearview mirror to see Scott Charlton, who was no longer in control of his motorcycle and who then crashed his motorcycle into the hillside on the east side of U.S. Route 250. Mr. Malkoff testified that he did not see whether the bump on the bridge caused Mr. Charlton to lose control of his motorcycle. Mr. Charlton died as a result of his accident.
Claimant is seeking $2,000,000.00 in damages, including medical bills and expenses, funeral bills, burial expenses, attorney’s fees, costs associated with the probate of the estate, and the loss of the expected income that Scott Charlton would have earned in his lifetime. Scott Charlton is survived by a pretermitted son as well as two siblings, his mother, and his stepfather.
Fred Hanscom, a highway research engineer, testified as an expert for Claimant in this claim. Mr. Hanscom is a member of the committee that writes the Manual of Uniform Traffic Control Devices (hereafter MUTCD), a guideline for all traffic control devices used by every state, including West Virginia, in marking its highways. The MUTCD is the standard of practice for applying signs, hazard warning signs, pavement markings, and all applicable roadway markings. Mr. Hanscom explained that warning signs are designed and intended to be placed at specific advance distances so that a driver has adequate time to see the sign, comprehend what it says, and recognize the hazard. Due to this prerequisite perception-reaction time, the MUTCD prescribes specific advance placement distances for warning signs, such as the curve warning sign and speed reduction sign involved in this case. According to the MUTCD, a warning sign placed in an area of a fifty-five miles per hour speed limit to advise a motorist to slow to thirty-five miles per hour requires an advance placement distance of three hundred fifty feet. In the instant case, there is a curve warning sign and speed reduction plate in advance of the curve on the bridge located on U.S. Route 250. This sign is located one hundred thirty-nine feet in advance of the beginning of the curve, some two hundred eleven feet short of the three hundred fi fty feet prescribed by the MUTCD. Mr. Hanscom indicated that not only was the sign placed well short of the recommended distance, but it was blocked from view by the embankment that ran along the roadside. He testified that even if a motorist could read the thirty-five miles per hour sign where it is located, it would still provide inadequate warning of the hazard involved. Mr. Hanscom stated that in his opinion this was an obvious violation of the MUTCD standards, resulting in an inadequate warning of the curve and the advised speed reduction.
Mr. Hanscom also testified as to the lack of a sign warning of a “bump” in the roadway. According to Mr. Hanscom, the bump on the bridge in the northbound lane was not perceivable to a motorist, and thus was a dangerous hazard that was not marked in any way. He believed that it was incumbent upon respondent, based upon the use of the MUTCD standards, to place warning signs in advance of this hazard. Mr. Hanscom further stated that based upon a West Virginia State Inspector’s bridge report recommending a repair of the bridge, a warning sign should have been placed there warning of the bump in the road, as recommended by the MUTCD. However, respondent did not place a warning sign for this bump: therefore, it did not provide the proper warning to any motorists using the road, including the claimant’s son, Mr. Charlton.
*213 Dr. John F. Burke, Jr., who has a doctorate in economics, testified for the claimant as to the earning capacity of Scott Charlton over a lifetime. Mr. Charlton was twenty-four at the time of his death, working in lawnmower sales at a reported $2,000.00 per month. Dr. Burke calculated that had Mr. Charlton survived, his life expectancy was an additional 51.3 years, based upon statistics produced bythe U.S. Department of Health and Human Services. A typical man in Mr. Charlton’s position also had a work-life expectancy of an additional 34.3 years. Based upon his calculations of work-life and life expectancy, and based upon the average wages of a person who has some post-high school education but not a four-year college education, Dr. Burke determined that Mr. Charlton would have earned $2,145,000.00 had he worked to the age of fifty-nine, and $2,560,000.00 had he worked to the age of sixty-seven to attain his full Social Security benefits.
The position of the respondent is that it was Scott Charlton’s failure to maintain control of his motorcycle that caused this accident, and not a “bump” in the northbound roadway of the bridge or the placement of the curve warning sign and the speed reduction plate.
Respondent asserts that Mr. Charlton did not have enough experience in the operation of motorcycles onroadways. Despite the fact that Mr. Charlton had been riding dirt bikes for some years, he did not obtain a motorcycle endorsement on his driver’s license until April 1999, one month prior to the date of the incident herein. Further, the motorcycle on which Mr. Charlton was riding had been purchased by him in April 1999. West Virginia State Trooper Michael Fordyce, the investigating officer, testified that he believed that the cause of the accident was a lack of experience in the operation of motorcycles combined with an unfamiliar road. In the accident report, Trooper Fordyce cited failure to maintain control of the motorcycle as a contributing factor in the accident.
Mark Poe, Maintenance Crew Leader for respondent in Wetzel County, testified that he had no knowledge of any problems associated with U.S. Route 250 in the area of Mr. Charlton’s accident. Mr. Poe stated that in August of 1998, his crew undertook a patching project along U.S. Route 250 for routine maintenance and hole patching. At that time, they made a small patch at the edge of the bridge in question in this case, in order to repair a low spot in the roadway. Randy Rush, Highway Administrator II for respondent in Wetzel County, testified that between 1997 and 1999 his office had received no complaints in regard to anything along that stretch of roadway on U.S. Route 250, including the bridge and the bridge approach. Respondent had not received any complaints concerning this patch between the time of the maintenance and the date of the incident involved herein.
Darrell Broughton, a team leader for respondent’s bridge inspection team, was in charge of the inspection of the bridge that took place on November 13, 1998. On a bridge inspection, the inspectors examine the wearing surface, railing, waterway alignment, and basically everything to do with the bridge. Upon this inspection, the only defect he noted was the approach roadways. Mr. Broughton stated that the northbound approach roadway to the bridge had already been repaired, which in fact was the section that respondent had patched in August 1999. However, Mr. Broughton testified that the southbound lane had settled about three-quarters of an inch. He stated “the settlement was continuous all the way across the roadway along the back wall but with the patch there, the patch smoothed out the transition located in the northbound lane.” He stated *214 that he was satisfied with the patch that had been made to the northbound lane. Mr. Broughton stated that he recommended that the partial repair be dealt with, in that it needed to be made completely across the roadway and not just in the northbound lane. His repair recommendation was submitted to the bridge inspection coordinator. Mr. Broughton stated that once he submitted his report it was up to the Bridge Department to decide what actions needed to be taken to implement his recommendations. The testimony of Randy Rush established that at no time were the respondent’s employees in Wetzel County made aware of the recommendations of Mr. Broughton as put forth in the bridge inspection report.
Charles RaymondLewis, II, Planning and Research Engineer for the Traffic and Engineering Division, testified for respondent as to the placement of the warning signs involved in this case. He testified that the distance from the point of curvature to the curve sign and speed reduction plate was one hundred thirty-nine feet. This sign assembly first became completely visible to oncoming motorists some five hundred sixty-seven feet before the sign. The MUTCD states that such a sign should be placed three hundred fifty feet from the point of curvature, but Mr. Lewis stated that the values included in the MUTCD are guidelines for engineers to base the placement of signs and that engineering discretion plays a large role in the actual placement of signs. These guidelines are not mandatory. They’re not rigorous. He stated that there were several factors that led to the placement of the curve and speed reduction plate at one hundred thirty-nine feet away from the curve as opposed to three hundred fifty feet as recommended by the MUTCD. There is a side road sign which indicates to a northbound driver that he is approaching an intersection. Mr. Lewis stated that without this sign, there would be no way for a driver new to the road to know of the upcoming intersection and that another driver may be pulling out onto the roadway. There is also a guide sign placed at the intersecting road, informing drivers of which way destinations are located on U.S. Route 250. There is also a stretch along the northbound roadway that has been improved for vehicles to park alongside the road. Mr. Lewis stated it would be inadvisable to place signs in an area where vehicles maneuver as the sign is likely to get knocked down. Further, there are sight distance constraints in this area due to the embankment that is on the east side of the northbound lane. Due to these considerations, Mr. Lewis stated that the location of the sign at one hundred thirty-nine feet was not unreasonable. He went on to state that because the MUTCD is only a guideline, there can be no violations of it. In order for there to be a violation, it has to be a standard that applies in all cases. The applicable sections of the MUTCD are only recommendations, recommendations that allow for engineer discretion.
The well-established principle of law in West Virginia is that the State is neither an insurer nor a guarantor of the safety of travelers upon its roads. Adkins vs. Sims, 130 W.Va. 645; 46 S.E.2d 81 (1947). In order to hold respondent liable for road defects of this type, a claimant must prove that respondent had actual or constructive notice of the defect and a reasonable time to take corrective action. Chapman vs. Dept. of Highways, 16 Ct. Cl. 103 (1986). Respondent may be held liable only for defective conditions on or near a highway caused by its negligence. State ex rel. vs. Gainer, 151 W.VA. 1002; 158 S.E.2d 145 (1967). However, respondent is held liable only for those defective conditions that are the proximate cause of claimant’s injuries or death. Roush vs. Johnson, 139 W.Va. 607; 80 S.E.2d 857 (1954). One requisite of proximate cause is the *215 doing of an act or the failure to do an act that a person of ordinary prudence could foresee may naturally or probably produce injury to or the death of another. The second requisite of proximate causation is that such act or omission did in fact produce the injury or death. Matthews vs. Cumberland & Allegheny Gas Co., 138 W.Va. 639; 77 S.E.2d 180 (1953).
In the instant claim, the claimant has failed to establish that the respondent committed any act or omission in its maintenance of the road and bridge in question that was the proximate cause of Mr. Charlton’s tragic death. Although the evidence established thatrespondenthadnotice ofthe need for further repairs on the bridge onU.S. Route 250 in Wetzel County, the evidence further established that the recommended maintenance was to have been performed on the southbound lane of traffic. The testimony adduced at hearing established that a crew for respondent had patched the northbound approach to the bridge involved in the incident herein in August of 1998. Respondent received no complaints in regard to this patch from the time the patch was put in place to the time of Mr. Charlton’s accident. The testimony at hearing also established that the while the northbound approach to the bridge had a satisfactory patch on it, the southbound lane was in need of a repair. Darrell Broughton testified that in his recommendation for repairs to the bridge on U.S. Route 250, he recommended that the partial patch be completed, as the patch that was in the northbound lane needed to be extended to repair the southbound lane which had also settled. Based upon the evidence with regard to the southbound lane needing repairs while the northbound lane was in a satisfactory condition, the Court is of the opinion that claimant has not established that the alleged bridge or road conditions were the proximate cause of the motorcycle leaving the roadway. Claimant also alleged that the placement of the curve sign and advisory speed plate by respondent was negligent in that the placement of the signs was short of the recommended distance. The Court is of the opinion that the MUTCD recommended distance is an advisoiy one and that respondent was not negligent in its placement of the curve sign and advisoiy speed plate.
The Court is not unmindful of the tragedy that struck this family on the date of the incident herein. The Court is very sympathetic to the claimant and her family; however, the Court has no legal basis upon which to make an award in this claim.
In accordance with the findings of fact and conclusions of law stated herein above, the Court is of the opinion to and does deny this claim.
Claim disallowed.
The Honorable Benjamin Hays Webb, II, fudge, took part in the hearing of this claim, but he did not participate in the decision or opinion due to his untimely death. The Honorable Franklin L. Gritt. Jr., Presiding Judge, took no part in the hearings of this claim, having recused himself. The Honorable Robert B. Sayre and the Honorable George F. Fordham, Jr., Interim Judges, took part in the decision and the opinion in this claim.